1   NIALL P. McCARTHY (SBN 160175)
    nmccarthy@cpmlegal.com
2   JUSTIN T. BERGER (SBN 250346)
    jberger@cpmlegal.com
3   ERIC J. BUESCHER (SBN 271323)
    ebuescher@cpmlegal.com
4   EMANUEL B. TOWNSEND (SBN 305373)
    etownsend@cpmlegal.com
5   **COTCHETT, PITRE & McCARTHY, LLP**
    San Francisco Airport Office Center
6   840 Malcolm Road
    Burlingame, CA 94010
7   Telephone: (650) 697-6000
    Facsimile: (650) 697-0577
8
9   *Attorneys for Relator*

10              **UNITED STATES DISTRICT COURT**

11            **NORTHERN DISTRICT OF CALIFORNIA**

12   UNITED STATES OF AMERICA *ex rel.*        CASE NO.   **CV16   2487**
     [FILED UNDER SEAL]; STATE OF
13   CALIFORNIA; *ex rel.* [FILED UNDER       **COMPLAINT FOR MONEY DAMAGES**
     SEAL],                                    **AND CIVIL PENALTIES FOR**
14                                             **VIOLATIONS OF THE FALSE CLAIMS**
                                               **ACT**
15            Plaintiffs,

16       v.                                    **DEMAND FOR JURY TRIAL**

17   [FILED UNDER SEAL],                       **[FILED IN CAMERA AND UNDER SEAL**
                                               **PURSUANT TO 31 U.S.C. § 3730(b)(2)]**
18            Defendant.

19

20

21

22

23

24

25

26

27

28

     **COMPLAINT**

NIALL P. McCARTHY (SBN 160175)
nmccarthy@cpmlegal.com
JUSTIN T. BERGER (SBN 250346)
jberger@cpmlegal.com
ERIC J. BUESCHER (SBN 271323)
ebuescher@cpmlegal.com
EMANUEL B. TOWNSEND (SBN 305373)
etownsend@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

*Attorneys for Relator STF, LLC*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* STF, LLC, an organization; STATE OF CALIFORNIA *ex rel.* STF, LLC, an organization, <br><br> Plaintiffs, <br><br> v. <br><br> VIBRANT AMERICA, LLC, a Delaware Limited Liability Company, <br><br> Defendant. | CASE NO. _____ <br><br> **COMPLAINT FOR MONEY DAMAGES AND CIVIL PENALTIES FOR VIOLATIONS OF THE FALSE CLAIMS ACT** <br><br> **DEMAND FOR JURY TRIAL** <br><br> **[FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)]** |

**COMPLAINT**

**TABLE OF CONTENTS**

PAGE No.

I.      INTRODUCTION...................................................................................1

II.     JURISDICTION AND VENUE ...........................................................2

III.    PARTIES ................................................................................................3

IV.     STATUTORY BACKGROUND ..........................................................3

        A.      The Federal False Claims Act.................................................3

        B.      The Medicare Program ...........................................................4

        C.      The California Insurance Frauds Protections Act...................7

V.      VIBRANT KNOWINGLY VIOLATED THE FEDERAL AND CALIFORNIA FALSE
        CLAIMS ACTS THROUGH AN ILLEGAL KICKBACK SCHEME..................8

VI.     VIBRANT ILLEGALLY PROMISES TO CAP.....................................10
        PATIENT CO-PAY AND DEDUCTIBLE RESPONSIBILITIES.............10

VII.    VIBRANT'S KICKBACK SCHEMES ALSO VIOLATE THE CALIFORNIA
        INSURANCE FRAUDS PROTECTIONS ACT......................................11

VIII.   CAUSES OF ACTION .........................................................................12

        FIRST CAUSE OF ACTION
        On Behalf of the United States Federal False Claims Act,
        Presenting False Claims 31 U.S.C. § 3729(a)(1)(A) .............................. 12

        SECOND CAUSE OF ACTION
        On Behalf of the United States Federal False Claims Act, Making or
        Using False Records or Statements Material to Payment or Approval
        of False Claims 31 U.S.C. § 3729(a)(1)(B)............................................ 13

        THIRD CAUSE OF ACTION
        On Behalf of the State of California California Insurance Frauds
        Prevention Act, Employment of Runners, Cappers and Steerers or Other Persons to Procure
        Patients Cal. Ins. Code § 1871.7(a) ....................................................... 14

        FOURTH CAUSE OF ACTION
        On Behalf of the State of California California Insurance Frauds
        Prevention Act, Presenting or Causing to be Presented False or
        Fraudulent Claims for the Payment of An Injury Under A Contract of
        Insurance Cal. Ins. Code § 1871.7(b); Cal. Pen. Code § 550(a)(1)........ 14

        FIFTH CAUSE OF ACTION

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

On Behalf of the State of California California Insurance Frauds Prevention Act, Knowingly Preparing or Making Any Writing in Support of a False or Fraudulent Claim Cal. Ins. Code § 1871.7(b); Cal. Pen. Code § 550(a)(5) ................................................................................. 15

SIXTH CAUSE OF ACTION
On Behalf of the State of California California Insurance Frauds Prevention Act, Knowingly Making or Causing to be Made Any False or Fraudulent Claim for Payment of a Health Benefit Cal. Ins. Code § 1871.7(b); Cal. Pen. Code § 550(a)(6) ................................................................................. 16

SEVENTH CAUSE OF ACTION
On Behalf of the State of California
California False Claims Act, Presenting False Claims
California Government Code § 12651(a)(1) ............................................................. 16

EIGHTH CAUSE OF ACTION
On Behalf of the State of California
California False Claims Act, Making Or Using
False Records Or Statements
To Obtain Payment Or Approval Of False Claims
California Government Code § 12651(a)(2) ............................................................. 17

IX.    PRAYER FOR RELIEF ......................................................................................... 17

X.    DEMAND FOR JURY TRIAL .............................................................................. 20

COMPLAINT

Plaintiffs UNITED STATES OF AMERICA ("United States"), and STATE OF CALIFORNIA ("California"), by and through Relator STF, LLC, allege as follows:

## I.   **INTRODUCTION**

1.      VIBRANT AMERICA, LLC ("VIBRANT" or "Defendant") is perpetrating a fraud on U.S. and California taxpayers through two related kickback schemes designed to defraud Medicare, Medicaid, and private health insurers.

2.      In one of its kickback schemes, VIBRANT enters into sham phlebotomy contracts with physicians' family members and staff members in order to induce physicians to refer their Medicare and Medicaid laboratory business to VIBRANT and to generally order excessive numbers of tests for both Medicare, Medicaid, and privately insured patients.  VIBRANT then pays kickbacks to physicians' family or staff members in the form of well above market and unlawful "Process and Handling" and "Collection" fees (collectively referred to herein as "draw fees") for each blood specimen physicians send to VIBRANT.  VIBRANT pays these draw fees to whomever it enters into the sham contract with, whether or not that person actually performs blood draws or is a licensed phlebotomist.

3.      In short, the physician or the physician's staff member performs a blood draw at the physician's office and then ships the sample to VIBRANT's lab in San Carlos, California.  The test is performed at the lab, and the test results are reported to the physician.  In exchange the physician's family member or staff member receives a $15 payment per patient for "processing and handling services" related to the blood sample.  These practices constitute an illegal kickback scheme, no more legal than if Defendant simply handed physicians envelopes of cash in exchange for Medicare, Medicaid, and other referrals.

4.      In another related kickback scheme, VIBRANT promises to cap patient deductible and/or co-payments at $25 for physicians' privately insured patients.  This $25 cap is of great value and benefit to physicians because it allows them to attract and retain patients by promising to perform all lab testing for no more than $25.  Additionally, VIRBARNT promises physicians that it will never send patients to collections for failure to pay the $25 deductible or co-payment.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

5.      VIBRANT's waiver of deductibles and co-payments and its payment of draw fees constitutes illegal remuneration, designed to: (1) "pull through" higher-paying Medicare and Medicaid business to Defendant, (2) entice Medicare, Medicaid, and privately insured patients to seek treatment from and/or continue to receive treatment from physicians whose family and staff members have illegal kickback arrangements with VIBRANT, and (3) induce physicians to order excessive numbers of tests from VIBRANT for their Medicare, Medicaid, and privately insured patients.

6.      Additionally, some TRICARE options require participating members to pay a co-pay and/or meet a deductible amount. 32 C.F.R. § 199.4(f).  A provider of services cannot, as a matter of law, waive these co-pay or deductible requirements. 32 C.F.R. § 199.4(f)(9). Accordingly, VIBRANT's waiver of deductibles and co-pays causes the submission of false claims for tests performed on TRICARE patients as well.  Furthermore, waiving insurance co-payments is explicitly illegal under the laws of several states.

7.      This is a *qui tam* action for violation of the federal False Claims Act (31 U.S.C. §§ 3150 et seq.) and the California False Claims Act (Cal. Gov. Code §§ 12650 et seq.) to recover treble damages, civil penalties and attorneys' fees and costs for Plaintiffs and on behalf of the United States, and California for fraudulent Medicare and Medicaid.  Non-public information personally known to Relator STF, LLC ("STF") serves as the basis for this action.  Defendant's schemes have also caused private insurers in California to be charged for tests performed on patients procured and/or retained via illegal kickbacks.  Accordingly, Relator brings claims under California Insurance Code §1871.7, *et seq.*, to recover fraudulent charges on behalf of the California Department of Insurance.

## II.     JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 31 U.S.C. sections 3730(b) and 3732(a), which confer jurisdiction on this Court for actions brought under the federal False Claims Act, and authorize nationwide service of process.  Venue is proper in this district pursuant to 31 U.S.C. section 3732(a), as VIBRANT's laboratory is located in the Northern District of California.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

## III.  PARTIES

9.      The plaintiffs in this action are the UNITED STATES OF AMERICA ("United States"), and the STATE OF CALIFORNIA ("California"), by and through Relator STF, LLC.

10.     Relator STF, LLC is a limited liability company, whose members are involved in the healthcare industry.

11.     Defendant VIBRANT AMERICA, LLC is a Delaware limited liability company with its principal places of business in San Carlos, California.

## IV.  STATUTORY BACKGROUND

### A.  The Federal False Claims Act

12.     The Federal False Claims Act ("FCA"), as amended by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. 111-21, section 4(f), 123 Stat. 1617, 1625 (2009), provides in pertinent part that a person is liable to the United States government for three times the amount of damages the government sustains because of the act of that person, plus a civil penalty, for each instance in which the person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(1)(1)(A).

13.     The FCA defines the term "claim" to mean "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be drawn down or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (i) provides or has provided any portion of the money or property requested or demanded; or (ii) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A).

14.     As amended by FERA, the FCA also makes a person liable to the United States government for three times the amount of damages which the government sustains because of the act of that person, plus a civil penalty, for each instance in which the person "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

15.  The FCA defines the terms "knowing" and "knowingly" to mean that a person, with respect to information: (1) "has actual knowledge of the information"; (2) "acts in deliberate ignorance of the truth or falsity of the information"; or (3) "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)-(iii).  The FCA further provides that "no proof of specific intent to defraud" is required.  31 U.S.C. § 3729(b)(1)(B).

**B.  The Medicare Program**

16.  Medicare is administered by the United States government and provides health coverage to people 65 years of age and older.  Medicare's costs are staggering.  In 2014, Medicare expenditures accounted for 14% of all federal spending.

17.  To ensure taxpayers' dollars are funding truly necessary and appropriate medical treatment, Medicare providers are prohibited from submitting reimbursement claims for items and services neither reasonable nor necessary for the diagnosis or treatment of a Medicare patient.  42 U.S.C. § 1395y(a)(1)(A).

18.  Medicare, along with the Department of Health and Human Services have long prohibited providers from charging Medicare for services which are tainted by unlawful kickbacks.  Unlawful kickback schemes are strictly prohibited by the Medicare statutes and give rise to False Claims Act liability.

19.  The Affordable Care Act, passed in March 2010, made explicit that violations of the Anti-Kickback Statute (42 U.S.C. § 1320a-7b) gave rise to False Claims Act liability: "a claim that includes items or services resulting from a violation of [the Anti-Kickback Statute] constitutes a false or fraudulent claim for purposes of [the False Claims Act]." 42 U.S.C. § 1320a-7b(g).

20.  Specifically, the Anti-Kickback Statute creates liability for "whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program. . . ." 42 U.S.C. § 1320a-7b(b)(2)(A) (emphasis added).

21.     Interpretations of this language by the federal authorities provide useful guidance in applying anti-kickback laws.  The Department of Health and Human Services, Office of the Inspector General ("OIG") has issued various advisory opinions regarding indicia of illicit schemes that providers have employed to defraud Medicare.

22.     In June 2005, the OIG issued an Advisory Opinion concluding that payments by a laboratory to referring physicians of $6 per day for "collection of blood samples," likely constituted "prohibited remuneration under the anti-kickback statute."  OIG Advisory Opinion No. 05-08, at pp. 1-2, available http://oig.hhs.gov/fraud/docs/advisoryopinions/2005/ao0508.pdf. Specifically, the OIG stated:

> Where a laboratory pays a referring physician to perform blood draws, particularly where the amount paid is more than the laboratory receives in Medicare reimbursement, an inference arises that the compensation is paid as an inducement to the physician to refer patients to the laboratory . . . .
>
> . . . . Because the physicians would receive a portion of the Lab's reimbursement for blood tests resulting from the physicians' referrals, the physicians have a strong incentive to order more blood tests.  As a result, there is a risk of overutilization and inappropriate higher costs to the Federal health care programs.

OIG Advisory Opinion No. 05-08, at p. 4 (emphasis added).

23.     OIG Advisory Opinion No. 05-08 considered whether a laboratory's proposal to pay physicians for the collection of blood samples and to provide free blood drawing supplies would constitute grounds for imposition of sanctions due to violation of the Anti-Kickback Statute. HHS concluded such a structure gave rise to the inference that the payments were made in exchange for referrals because the offer carried a "substantial risk that the Lab would be offering the blood draw remuneration to the physicians in exchange for referrals . . . [and that] the compensation provides an obvious benefit to the referring physician."  OIG Advisory Opinion No. 05-08 at 4.

24.     Standard industry practice allows a laboratory to pay physicians and medical assistants a nominal fee for the small amount of time it takes to draw, collect and package a specimen.  Medicare, for example, permits a $3 per patient payment to physicians for drawing a patient's specimen.  These "Specimen Processing Arrangements" must comply with the Anti-

1   Kickback Statute such that physicians are not induced to order medically unnecessary and

2   unreasonable tests in order to receive remuneration.

3      25.   However, as stated by the OIG, when a laboratory pays a referring physician for

4   performing blood draws, and the amount <u>exceeds</u> $3, "an inference arises that the compensation is

5   paid as an inducement to the physician to refer patients to the laboratory." OIG Advisory Opinion

6   No. 05-08, p. 4; *see also* OIG Special Fraud Alert:  Laboratory Payments to Referring Physicians,

7   p. 4, n.10 (June 2014) ("2014 Special Fraud Alert").

8      26.   The OIG's 2014 Special Fraud Alert described aspects of specimen processing

9   arrangements that evidence unlawful practices.  These aspects include:  (1) payment that exceeds

10   fair market value for services actually rendered by the party receiving the payment; (2) payment

11   that is made directly to the ordering physician rather than to the ordering physician's group

12   practice, which bears the cost of collecting and processing the specimen; and (3) payment that is

13   made on a per-test, per-patient, or other basis that takes into account the volume of referrals.  *See*

14   2014 Special Fraud Alert, p. 4-5.

15      27.   These statements are consistent with prior Advisory opinions, long notifying the

16   industry that giving anything of value not paid for at fair market value gives rise to an inference

17   that the gift is offered to induce business and is therefore a kickback.  *See* OIG Special Fraud

18   Alert: Arrangements for the Provision of Clinical Laboratory Services (issued October 1994,

19   available at https://oig.hhs.gov/fraud/docs/alertsandbulletins/121994.html ("Whenever a laboratory

20   offers or gives to a source of referrals anything of value not paid for at fair market value, the

21   inference may be made that the thing of value is offered to induce the referral of business.").

22      28.   California law is equally clear.  As stated in a recent Notice issued by the California

23   Department of Public Health, the following scenario violates California's Anti-Kickback provision

24   (Business and Professions Code § 650):

25         An employee of a physician is also paid by a laboratory as an "independent"
           phlebotomist to collect specimens for the physician's patients.  After the
26         issuance of the federal OIG Special Fraud Alert issued June 25, 2014, a
           laboratory has changed its practices and now enters into a contractual
27         arrangement directly with an individual, who is a member of a physician's
           office staff, to provide phlebotomy services to the laboratory.  The
28         individual provides the phlebotomy services on-site in the physician's

1   office. The individual remains an employee of the physician's office and
2   simultaneously receives payments directly from the laboratory as an
    independent contractor to the laboratory. In some circumstances the
3   physician reduces the salary or compensation to that individual when such
    an arrangement is in place.

4   *See* https://www.cdph.ca.gov/programs/lfs/Documents/CLTAC%20Non-

5   Compliance%20Inducement%20letter.pdf (last visited April 15, 2016).

6   **C. The California Insurance Frauds Protections Act**

7       29.     Additionally, pursuant to the California Insurance Frauds Protections Act ("IFPA"),

8   which is located under section 1871.7(a) of the California Insurance Code, it is "unlawful to

9   knowingly employ runners, cappers, steerers, or other persons to procure clients or patients to

10  perform or obtain services or benefits . . . or to procure clients or patients to perform or obtain

11  services or benefits under a contract of insurance or that will be the basis of a claim against an

12  insured individual or his or her insurer."  This provision has been construed as prohibiting

13  charging private insurers for services procured via kickbacks.

14      30.     The IFPA allows members of the public to file private *qui tam* suits against anyone

15  who commits insurance fraud in the state.  Like the Federal and California False Claims Acts, any

16  person or entity that violates the IFPA is subject to a civil penalty of up to $10,000 for each claim

17  submitted to an insurer for payment.  The person or entity is also subject to treble damages for the

18  amount of the claim for compensation billed to the insurer.

19      31.     Unlike the non-insurance-related false claims *qui tam* actions, under the IFPA it is

20  not necessary that the government suffer harm as a result of the fraud.  This is due to the fact that

21  insurance fraud usually harms a large number of people, as insurance companies frequently cite

22  insurance fraud losses in raising rates for policyholders.  (For example, the IFPA states that

23  healthcare insurance fraud likely increases national healthcare costs by "billions of dollars

24  annually.")  Thus, individuals who sue fraudulent actors under the IFPA are acting on behalf of

25  themselves and every one of their fellow policyholders as well as for the State of California.

26  / / /

27  / / /

28  / / /

## V. VIBRANT KNOWINGLY VIOLATED THE FEDERAL AND CALIFORNIA FALSE CLAIMS ACTS THROUGH AN ILLEGAL KICKBACK SCHEME

32.     VIBRANT, to induce physicians to order laboratory tests from its laboratory, enters into sham phlebotomy contracts with physician offices. VIBRANT Sales Representatives contact physicians with offers to make the physicians' family members or staff members "independent contractors" of VIBRANT. Specifically, physicians are told that their relatives and staff members can enter into sham contracts with VIBRANT, whereby the family member or staff member is deemed an "independent contractor." VIBRANT then pays the family member or staff member a separate $15 draw fee for each blood specimen drawn and submitted to VIBRANT for testing. This is a sham designed to provide remuneration to physicians in exchange for laboratory test orders.

33.     VIBRANT pays the $15 draw fee irrespective of who actually performs the blood draw. For example, in or about December 2015, VIBRANT pitched its scheme to a California physician. When the physician indicated that they did not have staff in the office who would be appropriate to serve as an "independent contractor" phlebotomist, VIBRANT suggested that a family member of the physician sign up as an "independent contractor," thereby allowing the physician to receive the draw fees. VIBRANT recommended to the physician that it be a family member with a different last name, so as not to raise suspicions. VIBRANT ultimately signed an "independent contractor" agreement with the physician's spouse, who has a different last name and is not a licensed phlebotomist.

34.     This arrangement allows the physician or their medical staff to supplement their income. By ordering tests through VIBRANT, physicians are able to direct cash to a family member or pay their staff less, appease their staff, and in some instances, obtain a portion of the medical staff's kickback.

35.     VIBRANT's scheme is a deliberate violation of anti-kickback statutes.

36.     Relator is in possession of direct evidence of VIBRANT's scheme. Attached hereto as **Exhibit A** is VIBRANT's standard "Phlebotomy Consulting Agreement" ("Consulting

1  Agreement") through which it establishes a sham independent contractor arrangement with

2  physicians' family members or office staff.

3      37.   Attached hereto as **Exhibit B** is VIBRANT's standard "Phlebotomy Services

4  Agreement" ("Services Agreement"), which describes the $15 fee VIBRANT pays to the

5  physicians' family member or staff member.  VIBRANT describes the $15 fee as a "Process and

6  Handling Fee" and a "Collection Fee."

7      38.   Attached hereto as **Exhibit C** is a check from VIRBRANT to the family-member of

8  the aforementioned California physician.  The check is for $345 for "March-Phlebotomy."

9  VIBRANT paid the $345 to the physician's family-member even though the family-member did

10  not perform any blood draws.

11      39.   As previously stated, Medicare pays $3 draw fees per patient.  Here, VIBRANT

12  pays $15 draw fees, which it calls "Process and Handling" and "Collection" fees.  This

13  remuneration is illegal as it is intended to induce medical assistants and physicians to order

14  laboratory tests.

15      40.   VIBRANT's practices are an unlawful kickback scheme, strictly prohibited by the

16  Medicare statutes and other laws, and give rise to False Claims Act liability.

17      41.   Like the "collection" fees paid in the OIG Advisory Opinion's scenario noted

18  above, VIBRANT's "Process and Handling" and "Collection" fees and other "compensation

19  provides an obvious financial benefit to the referring physician, and it may be inferred that this

20  benefit would be in exchange for referrals to the Lab."  OIG Advisory Opinion No. 05-08, at p. 4.

21  The "Process and Handling" and "Collection" fees paid by VIBRANT is many multiples of

22  Medicare's $3 draw fee.  This alone gives rise to an inference of illegal remuneration.  Moreover,

23  as in the scenario considered by the OIG's Advisory Opinion, the "Process and Handling" and

24  "Collection" fees provided by VIBRANT have the effect of incentivizing physicians to order more

25  tests, creating a "risk of overutilization and inappropriate higher costs to the Federal health care

26  programs."  *See Id.* at p. 4.

27      42.   VIBRANT presented to Medicare and Medicaid claims for reimbursement of

28  laboratory tests which were neither reasonable nor necessary but were ordered by physicians in

**COMPLAINT**                                                                                    9

exchange for kickbacks. As such, each of these claims constitutes a false claim in violation of the Federal and California False Claims Acts. VIBRANT certified, both explicitly and implicitly, that each claim it submitted to Medicare would fully comply with all statutes and regulations, and that as Medicare providers it would comply with all pertinent statutes and regulations.

## VI. VIBRANT ILLEGALLY PROMISES TO CAP PATIENT CO-PAY AND DEDUCTIBLE RESPONSIBILITIES

43.     In October 1994, the OIG issued a Special Fraud Alert, entitled "How Does the Anti-Kickback Statute Relate to Arrangement for the Provision of Clinical Lab Services?" (1994 Special Fraud Alert: available at http:oig.hhs.gov/fraud/docs/alertsandbulletins/121994.htms.) As an example of an illegal kickback, the Special Fraud Alert cited laboratories that waive charges to providers for lab tests of managed care patients (such as the deductible and co-payments of patients here).

44.     A significant portion of a physician's non-Medicare and non-Medicaid patients will be covered by private insurance. In recent years patient deductible amounts have escalated dramatically, with many plans having patient deductibles between $2,000 and $5,000.

45.     In order to induce the referral of additional business, especially government pay business, VIBRANT does not charge patients any amount in excess of $25, regardless of the patient's responsibility. VIBRANT also agrees not to send any patients to collections, even if the $25 is never paid. Regardless of the amount VIBRANT bills, and regardless of the amount a patient is ultimately responsible for under their insurance plan, the patient is never charged more than $25. Even worse, VIBRANT instructs physicians to tell their patients to ignore any deductible or co-pay charges.

46.     VIBRANT offers a variety of panels. Two that are frequently ordered together are the Cardiovascular and Women's Health panels. **Exhibit D**, attached hereto, shows the tests, CPT codes and Medicare reimbursement for these panels. Combined, the deductible costs for these panels amount to more than $650. If additional tests are ordered, the deductible costs can exceed $1,000. Patients on statin medication may receive up to four panels per year. An actual

1   VIBRANT test requisition containing VIBRANT's Cardiovascular Panel is attached hereto as

2   **Exhibit E**.  VIBRANT provided this requisition to the aforementioned California physician.

3       47.    After meeting their deductible obligations, most private insurance companies

4   require that a patient make a co-payment of 20% of allowable charges for laboratory tests.  This

5   would amount to over $130 for the combination Cardiovascular and Women's Health panels.

6   With additional tests, the patient co-payment can exceed $200.  VIBRANT does not collect these

7   amounts.

8       48.    VIBRANT knows this strategy is illegal because it provides a significant benefit to

9   a referring physician.  In an effort to conceal its scheme and avoid liability, VIBRANT does not

10   list this policy on its website.  Instead, this information is communicated personally by VIBRANT

11   Sales Representatives.  In or around April of 2016, Tanja Elliott, VIBRANT's southern California

12   Sales Representative, explained this policy to a southern California physician.

13       49.    While VIBRANT loses money on uncollected patient deductible and co-payments,

14   it more than makes up the difference with the profits it earns on the Medicare and Medicaid

15   referrals from doctors, which are obtained through VIBRANT's marketing and sales kickback

16   scams.  This Medicare and Medicaid business, induced by the combination of deductible and co-

17   payment waivers for privately insured patients and cash paid to physicians for each referral, is

18   referred to in the industry as "pull-through" business

19       50.    VIBRANT's policy and practice of capping or waiving patient co-pays and/or

20   deductibles and its policy and practice of refusing to send patients to collections violate the Federal

21   and California False Claims Acts.

22   **VII.   VIBRANT'S KICKBACK SCHEMES ALSO VIOLATE THE CALIFORNIA**
23   **     INSURANCE FRAUDS PROTECTIONS ACT**

24       51.    VIBRANT's capping or waiving of patient co-pays and/or deductibles, its refusal to

25   send patients to collections, and its payment of $15 draw fees to physicians' family and staff

26   members also violate the California Insurance Code.  Pursuant to California Insurance Code §

27   1871.7(a), it is "unlawful to knowingly employ runners, cappers, steerers, or other persons to

28   procure clients or patients to perform or obtain services or benefits . . . or to procure clients or

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

1  patients to perform or obtain services or benefits under a contract of insurance or that will be the

2  basis of a claim against an insured individual or his or her insurer." As noted earlier, Section

3  1871.7(a) has been construed as prohibiting charging private insurers for services procured via

4  kickbacks.

5       52.    Like the Federal False Claims Act, any person or entity that violates § 1871.7(a) is

6  subject to a civil penalty of up to $10,000 for each claim submitted to an insurer for payment.  The

7  person or entity is also subject to treble damages for the amount of the claim for compensation

8  billed to the insurer.

9       53.    VIBRANT's $15 draw fees, its capping and waiving of co-pays and deductibles,

10 and its refusal to send patients to collections for failure to pay the $25 dollar deductible or co-

11 payment are fraudulent kickback schemes.  VIBRANT's fraudulent kickback schemes violate

12 California Insurance Code § 1871.7(a) because they cause VIBRANT's sales representatives to act

13 as "runners, cappers, steerers, or other persons" to procure physicians (i.e., "clients"), who in turn

14 perform tests "that will be the basis of a claim against an insured individual or his or her insurer."

15 (Cal. Ins. Code § 1871.7).  These violations subject VIBRANT to treble damages for the amount

16 of the claim for compensation billed to the insurer.

17

18 **VIII.   CAUSES OF ACTION**

19                          **FIRST CAUSE OF ACTION**
                              **On Behalf of the United States**
20               **Federal False Claims Act, Presenting False Claims**
                              **31 U.S.C. § 3729(a)(1)(A)**
21

22       54.    Relator incorporates by reference and realleges all of the allegations contained in

23 paragraphs 1 through 53 of this Complaint as though fully set forth herein.

24       55.    Defendant knowingly (as defined in 31 U.S.C. § 3729(b)(1)) caused to be presented

25 false claims for payment or approval to an officer or employee of the United States.

26       56.    Defendant knowingly caused to be presented false records and statements, including

27 but not limited to bills, invoices, requests for reimbursement, and records of services, in order to

28 obtain payment or approval of charges by the Medicare, Medicaid, and other government-funded

programs that were higher than they were permitted to claim or charge by applicable law.  Among other things, Defendant knowingly caused the submission of false claims for Medicare, Medicaid, and other government programs' business that was obtained by means of, and as a result of, illegal kickbacks.

57.     The conduct of Defendant violated 31 U.S.C. § 3729(a)(1)(A) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

## SECOND CAUSE OF ACTION
### On Behalf of the United States
### Federal False Claims Act, Making or Using False Records or Statements
### Material to Payment or Approval of False Claims
### 31 U.S.C. § 3729(a)(1)(B)

58.     Relator incorporates by reference and realleges all of the allegations contained in paragraphs 1 through 53 of this Complaint as though fully set forth herein.

59.     Defendant knowingly (as defined in 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used false records or statements material to false or fraudulent claims.

60.     Defendant knowingly made, used, and/or caused to be made and used false records and statements, including but not limited to bills, invoices, requests for reimbursement, and records of services, that were material to the payment or approval of charges by the Medicare, Medicaid, and other government programs that were higher than they were permitted to claim or charge by applicable law.  Among other things, Defendant knowingly caused the submission of false claims for Medicare, Medicaid, and other government programs' business that was obtained by means of, and as a result of, illegal kickbacks.

61.     Defendant knowingly made, used, and caused to be made and used false certifications that its claims, and all documents and data upon which those claims were based, were accurate, and were supplied in full compliance with all applicable statutes and regulations.

62.     The conduct of Defendant violated 31 U.S.C. § 3729(a)(1)(B) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

### THIRD CAUSE OF ACTION
**On Behalf of the State of California**
**California Insurance Frauds Prevention Act, Employment of Runners, Cappers and Steerers**
**or Other Persons to Procure Patients**
**Cal. Ins. Code § 1871.7(a)**

63.     Relator incorporates by reference and realleges all of the allegations contained in paragraphs 1 through 53 of this Complaint as though fully set forth herein.

64.     Pursuant to California Insurance Code §1871.7(a), it is unlawful to knowingly employ runners, cappers, steerers, or other persons to procure patients for the purpose of submitting a claim to that patient's insurance carrier.

65.     Defendant unlawfully incentivized physicians by paying illegal remuneration for the purpose of procuring more physicians to order tests, which were ultimately submitted to Medicare, Medicaid, other government programs, and private insurance companies for reimbursements, in violation of Cal. Ins. Code §1871.7(a).

66.     Because the claims submitted to medical insurers by Defendant were procured by runners, cappers, and steerers and other persons, these claims were false and fraudulent under the California Insurance Frauds Prevention Act.

67.     This conduct was a substantial factor causing damages detailed herein.

### FOURTH CAUSE OF ACTION
**On Behalf of the State of California**
**California Insurance Frauds Prevention Act, Presenting or Causing to be Presented False or**
**Fraudulent Claims for the Payment of An Injury Under A Contract of Insurance**
**Cal. Ins. Code § 1871.7(b); Cal. Pen. Code § 550(a)(1)**

68.     Relator incorporates by reference and realleges all of the allegations contained in paragraphs 1 through 53 of this Complaint as though fully set forth herein.

69.     Defendant has caused to be presented false and fraudulent claims for reimbursement of tests, or conspired to present or cause to be presented such false and fraudulent claims.

70.     These claims were fraudulent because:

- Defendant caused the submission of claims to Medicare, Medicaid, other government programs, and private insurers for medically unnecessary and unreasonable tests.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

• Defendant caused the submission of claims for reimbursement for tests that were procured by means of, or otherwise involved, the payment of illegal kickbacks.

71. Defendant either directly presented such false claims for payment to insurers, or caused such false claims to be presented.

72. This conduct was a substantial factor causing damages detailed herein.

### FIFTH CAUSE OF ACTION
On Behalf of the State of California
California Insurance Frauds Prevention Act, Knowingly Preparing or Making Any Writing in Support of a False or Fraudulent Claim
Cal. Ins. Code § 1871.7(b); Cal. Pen. Code § 550(a)(5)

73. Relator incorporates by reference and realleges all of the allegations contained in paragraphs 1 through 53 of this Complaint as though fully set forth herein.

74. Defendant has either knowingly prepared, made, or subscribed a writing with an intent to present or use it, or to allow it to be presented, in support of false and fraudulent claims for the reimbursement of tests performed on patients, or has aided, abetted, and solicited, or conspired to make, or subscribe such a writing.

75. These writings include bills for payment presented to insurance carriers for payment, and invoices prepared in support of such bills for payment. Such bills for payment constitute false or fraudulent claims because through those bills:

• Defendant caused the submission of claims to Medicare, Medicaid, other government programs, and private insurers for medically unnecessary and unreasonable tests.

• Defendant caused the submission of claims for reimbursement for tests that were procured by means of, or otherwise involved, the payment of illegal kickbacks.

76. Defendant either directly presented such false claims for payment to insurers, or caused such false claims to be presented.

77. This conduct was a substantial factor causing damages detailed herein.

/ / /

COMPLAINT                                                                 15

## SIXTH CAUSE OF ACTION
### On Behalf of the State of California
**California Insurance Frauds Prevention Act, Knowingly Making or Causing to be Made Any False or Fraudulent Claim for Payment of a Health Benefit**
**Cal. Ins. Code § 1871.7(b); Cal. Pen. Code § 550(a)(6)**

78.     Relator incorporates by reference and realleges all of the allegations contained in paragraphs 1 through 53 of this Complaint as though fully set forth herein.

79.     Defendant has either knowingly presented or caused to be presented false and fraudulent claims for reimbursement of tests performed on patients, or has aided, abetted, and solicited, or conspired to present or cause to be presented such false and fraudulent claims.

80.     The claims were false or fraudulent because:

- Defendant caused the submission of claims to Medicare, Medicaid, other government programs, and private insurers for medically unnecessary and unreasonable tests.

- Defendant caused the submission of claims for reimbursement for tests that were procured by means of, or otherwise involved, the payment of illegal kickbacks.

81.     Defendant either directly presented such false claims for payment to insurers, or caused such false claims to be presented.

82.     This conduct was a substantial factor causing damages detailed herein.

## SEVENTH CAUSE OF ACTION
### On Behalf of the State of California
**California False Claims Act, Presenting False Claims**
**California Government Code § 12651(a)(1)**

83.     Relator incorporates by reference and realleges all of the allegations contained in paragraphs 1 through 53 of this Complaint as though fully set forth herein.

84.     Defendant knowingly (as defined in California Government Code section 12650, subdivision (b)(2)), presented or caused to be presented false claims for payment or approval to an officer or employee of California.

85.     Defendant knowingly caused to be presented claims for payment or approval for services that were procured by means of illegal kickbacks.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

86.    The conduct of Defendant violated Government Code section 12651, subdivision (a)(1), and caused California to sustain damages in an amount according to proof pursuant to California Government Code section 12651, subdivision (a).

### EIGHTH CAUSE OF ACTION
**On Behalf of the State of California**
**California False Claims Act, Making Or Using**
**False Records Or Statements**
**To Obtain Payment Or Approval Of False Claims**
**California Government Code § 12651(a)(2)**

87.    Plaintiff incorporates by reference and realleges all of the allegations contained in paragraphs 1 through 53 of this Complaint as though fully set forth herein.

88.    Defendant knowingly (as defined in California Government Code section 12650, subdivision (b)(2)), made, used, or caused to be made or used false records or statements to get false claims paid or approved by California.

89.    Defendant knowingly made, used, and/or caused to be made and used false records and statements, including but not limited to claims, bills, invoices, requests for reimbursement, and records of services, in order to obtain payment or approval of charges to the Medi-Cal program for services that were procured by illegal kickbacks.

90.    The conduct of Defendant violated Government Code section 12651, subdivision (a)(2), and caused California to sustain damages in an amount according to proof pursuant to Government Code section 12651, subdivision (a).

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff by and through Relator, pray judgment in its favor and against Defendant as follows:

91.    Defendant's conduct violated the Federal False Claims Act, California False Claims Act, and the California Insurance Frauds Prevention Act, and was a substantial factor in causing the United States and the state of California, to sustain damages in an amount according to proof pursuant to the Federal False Claims Act, the California Insurance Frauds Prevention Act, and the California False Claims Act.  That judgment be entered in favor of plaintiffs UNITED STATES

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

OF AMERICA, and STATE OF CALIFORNIA, ex rel. STF, LLC, and against Defendant

VIBRANT AMERICA, LLC, according to proof, as follows:

    a.    On the **First Cause of Action** (Presenting False Claims (31 U.S.C. §

        3729(a)(1)(A))) damages as provided by 31 U.S.C. § 3729(a)(1), in the amount of:

        i.    Triple the amount of damages sustained by the Government;

        ii.    Civil penalties of Eleven Thousand Dollars ($11,000.00) for each false

            claim;

        iii.    Recovery of costs;

        iv.    Pre- and post-judgment interest;

        v.    Such other and further relief as the Court deems just and proper;

    b.    On the **Second Cause of Action** (False Claims Act; Making or Using False Records

        or Statements Material to Payment or Approval of False Claims (31 U.S.C. §

        3729(a)(1)(B))) damages as provided by 31 U.S.C. § 3729(a)(1) in the amount of:

        i.    Triple the amount of damages sustained by the Government;

        ii.    Civil penalties of Eleven Thousand Dollars ($11,000.00) for each false

            claim;

        iii.    Recovery of costs;

        iv.    Pre- and post-judgment interest;

        v.    Such other and further relief as the Court deems just and proper;

    c.    On the **Third, Fourth, Fifth, and Sixth Causes of Action** (California Insurance

        Frauds Prevention Act §§ 1871.7(a) and (b) and California Penal Code §§550(a)(1);

        550(a)(5); 550(a)(6) and 549) damages as provided by California Insurance Frauds

        Prevention Act §§ 1871.7, et seq., in the amount of:

        i.    Civil penalties of Eleven Thousand Dollars ($10,000) for each false and

            fraudulent claim submitted, presented or caused to be submitted or presented

            to an insurance company;

        ii.    Assessments of three-times the amount of each claim for compensation

            made by Defendants;

        iii.    Recovery of costs;

        iv.    Pre- and post-judgment interest;

        v.    Such other and further relief as the Court deems just and proper.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

d.   On the **Seventh Cause of Action** (Presenting or Causing to be Presented False Claims (Cal. Gov. Code § 12651(a)(1)) damages as provided by Cal. Gov. Code § 12651(a), in the amount of:

   i.    Triple the amount of California's damages;

   ii.   Civil penalties of Eleven Thousand Dollars ($11,000.00) for each false claim;

   iii.  Recovery of costs, attorneys' fees, and expenses;

   iv.   Pre- and post-judgment interest;

   v.    Such other and further relief as the Court deems just and proper

e.   On the **Eighth Cause of Action** (Making Or Using False Records Or Statements To Obtain Payment Or Approval Of False Claims California Government Code § 12651(a)(2)) damages as provided by Cal. Gov. Code § 12651(a), in the amount of:

   i.    Triple the amount of California's damages;

   ii.   Civil penalties of Eleven Thousand Dollars ($11,000.00) for each false claim;

   iii.  Recovery of costs, attorneys' fees, and expenses;

   iv.   Pre- and post-judgment interest;

   v.    Such other and further relief as the Court deems just and proper

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

92.     Further, Relator, on its own behalf, pursuant to 31 U.S.C. section 3730(d), California Insurance Frauds Prevention Act §§ 1871.7(g)(1)(A), and the False Claims Acts and applicable laws of California, requests that Relator receive such maximum amount as permitted by law, of the proceeds of this action or settlement of this action collected by the United States and/or California, plus an amount for reasonable expenses incurred, plus reasonable attorneys' fees and costs of this action.  Relator requests that its percentage be based upon the total value recovered, including any amounts received from individuals or entities not parties to this action.

Respectfully Submitted,

Dated:  May 9, 2016              **COTCHETT, PITRE & McCARTHY, LLP**

By: _____

NIALL P. McCARTHY
JUSTIN T. BERGER
ERIC J. BUESCHER
EMANUEL B. TOWNSEND

*Attorneys for Relator STF, LLC*

## X.     DEMAND FOR JURY TRIAL

Relator STF, LLC hereby demands a jury trial on all issues so triable.

Respectfully Submitted,

Dated:  May 9, 2016              **COTCHETT, PITRE & McCARTHY, LLP**

By: _____

NIALL P. McCARTHY
JUSTIN T. BERGER
ERIC J. BUESCHER
EMANUEL B. TOWNSEND

*Attorneys for Relator STF, LLC*

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

# EXHIBIT A

## PHLEBOTOMY CONSULTING AGREEMENT

This Consulting Agreement ("*Agreement*") is entered into as of _12-25-15_ (the "*Effective Date*"), between **Vibrant America, LLC**, of 1021 Howard Ave, Suite B, San Carlos, CA 94070 ("*Company*"), and ▓▓▓▓▓▓▓▓▓▓▓ ("*Consultant*").

Company and Consultant desire to have Consultant perform services for Company, subject to and in accordance with the terms and conditions of this Agreement.

THEREFORE, the parties agree as follows:

### 1.   SERVICES.

1.1   Statements of Work.   From time to time, Company and Consultant may execute one or more statements of work, substantially in the form attached hereto as Exhibit A, that describe the specific services to be performed by Consultant (as executed, a "*Statement of Work*"). Each Statement of Work will expressly refer to this Agreement, will form a part of this Agreement, and will be subject to the terms and conditions contained herein.   A Statement of Work may be amended only by written agreement of the parties.

1.2   Performance of Services.   Consultant will perform the services described in each Statement of Work (the "*Services*") in accordance with the terms and conditions set forth in each such Statement of Work and this Agreement. Consultant warrants and represents that Consultant has all necessary training, experience, certifications and/or licensure required in order to properly perform the Services.

1.3   Delivery.   Consultant will deliver to Company the deliverables, designs, modules, software, products, documentation and other materials specified in the Statement of Work (individually or collectively, "*Deliverables*") in accordance with the delivery schedule and other terms and conditions set forth in the Statement of Work.

1.5   Acceptance   Testing.   Following Consultant's delivery of each Deliverable, Company (with the assistance of Consultant, if so requested) will review, evaluate and/or test each Deliverable in accordance with the testing procedures identified in the Statement of Work to confirm that the Deliverable satisfies, conforms with or operates in accordance with the acceptance criteria, specifications or requirements for such Deliverable, as specified in the Statement of Work (collectively, the "*Acceptance Criteria*"), as applicable.   Company will use its commercially reasonable efforts to review, evaluate and/or test the Deliverable within the time period set forth in the Statement of Work.   If the Deliverable fails to satisfy the applicable Acceptance Criteria, then Company will promptly furnish Consultant with a reasonably detailed report that identifies the specific defects in the Deliverable (a "*Defect Report*") and, if applicable, the modifications to the Deliverable that need to be made in order for the Deliverable to satisfy the applicable Acceptance Criteria.   Upon receipt of such a Defect Report, Consultant will use its best efforts promptly to modify the Deliverable in accordance with the Defect Report and re-submit the Deliverable to Company to review, evaluate and/or test in accordance with the terms of this Section.   The foregoing procedure will repeat until Company finally accepts or rejects the Deliverable.   If Company finally rejects a Deliverable, then Company may terminate the applicable portion of the Statement of Work or, if specified in the Statement of Work, this Agreement, immediately upon written notice to Consultant.

### 2.   PAYMENT

2.1   Fees.   As Consultant's sole compensation for the performance of Services, Company will pay Consultant the fees specified in each Statement of Work in accordance with the terms set forth therein. Without limiting the generality of the foregoing Consultant acknowledges and agrees that, if specified in the Statement of Work, Company's payment obligation will be expressly subject to Company's acceptance of the Deliverables in accordance with the terms and conditions set forth in Section 1.5.

2.2    Expenses.  Unless otherwise specified in the Statement of Work, Company will not reimburse Consultant for any expenses incurred by Consultant in connection with performing Services.

2.3    Payment Terms.    All fees and other amounts set forth in the Statement of Work, if any, are stated in and are payable in U.S. dollars. Unless otherwise provided in a Statement of Work, Consultant will invoice Company on a monthly basis for all fees and expenses payable to Consultant. Company will pay the full amount of each such invoice within thirty (30) days following receipt thereof, except for any amounts that Company disputes in good faith. The parties will use their respective commercially reasonable efforts to promptly resolve any such payment disputes.

## 3.    RELATIONSHIP OF THE PARTIES

3.1    Independent Contractor.  Consultant is an independent contractor and nothing in this Agreement will be construed as establishing an employment or agency relationship between Company and Consultant or any Consultant Personnel. Consultant has no authority to bind Company by contract or otherwise. Consultant will perform Services under the general direction of Company, but Consultant will determine, in Consultant's sole discretion, the manner and means by which Services are accomplished, subject to the requirement that Consultant will at all times comply with applicable law.

3.2    Taxes and Employee Benefits.  Consultant will report to all applicable government agencies as income all compensation received by Consultant pursuant to this Agreement. Consultant will be solely responsible for the payment of all compensation to all Consultant Personnel, as well as for payment of all withholding taxes, social security, workers' compensation, unemployment and disability insurance or similar items required by any government agency. Consultant Personnel will not be entitled to any benefits paid or made available by Company to its employees, including, without limitation, any vacation or illness payments, or to participate in any plans, arrangements or distributions made by Company pertaining to any bonus, stock option, profit sharing, insurance or similar benefits. Consultant will indemnify and hold Company harmless from and against all damages, liabilities, losses, penalties, fines, expenses and costs (including reasonable fees and expenses of attorneys and other professionals) arising out of or relating to any obligation imposed by law on Company to pay any withholding taxes, social security, unemployment or disability insurance or similar items in connection with compensation received by Consultant pursuant to this Agreement.

3.3    Liability    Insurance.    Consultant acknowledges that Company will not carry any liability insurance on behalf of Consultant. Consultant will maintain in force adequate liability insurance to protect Consultant from: (i) claims under workers' compensation and state disability acts; and (ii) claims of personal injury (or death) or tangible or intangible property damage (including loss of use) that arise out of any act or omission of Consultant or any Consultant Personnel.

## 4.    OWNERSHIP

4.1    Disclosure of Work Product.  Consultant will, as an integral part of the performance of Services, disclose in writing to Company all inventions, products, designs, drawings, notes, documents, information, documentation, improvements, works of authorship, processes, techniques, know-how, algorithms, specifications, biological or chemical specimens or samples, hardware, circuits, computer programs, databases, user interfaces, encoding techniques, and other materials of any kind that Consultant may make, conceive, develop or reduce to practice, alone or jointly with others, in connection with performing Services, or that result from or that are related to such Services, whether or not they are eligible for patent, copyright, mask work, trade secret, trademark or other legal protection (collectively, *"Consultant Work Product"*). Consultant Work Product includes without limitation any Deliverables that Consultant delivers to Company pursuant to Section 1.5.

4.2    Ownership of Consultant Work Product. Consultant agrees that all Consultant Work Product will be the sole and exclusive property of Company. Consultant hereby irrevocably transfers and assigns to Company, and agrees to irrevocably transfer and assign to Company, all right, title and interest in and to the Consultant Work Product, including all worldwide patent rights (including patent applications and disclosures), copyright rights, mask work rights, trade secret rights, know-how, and any and all other intellectual property or

2

proprietary rights (collectively, *"Intellectual Property Rights"*) therein. At Company's request and expense, during and after the term of this Agreement, Consultant will assist and cooperate with Company in all respects and will cause all Consultant Personnel to assist and cooperate with Company in all respects, and will execute documents and will cause all Consultant Personnel to execute documents, and will take such further acts reasonably requested by Company to enable Company to acquire, transfer, maintain, perfect and enforce its Intellectual Property Rights and other legal protections for the Consultant Work Product. Consultant hereby appoints the officers of Company as Consultant's attorney-in-fact to execute documents on behalf of Consultant for this limited purpose.

4.3    Moral Rights.    To the fullest extent permitted by applicable law, Consultant also hereby irrevocably transfers and assigns to Company, and agrees to irrevocably transfer and assign to Company, and waives and agrees never to assert, any and all Moral Rights (as defined below) that Consultant or any Consultant Personnel may have in or with respect to any Consultant Work Product, during and after the term of this Agreement. *"Moral Rights"* mean any rights to claim authorship of a work, to object to or prevent the modification or destruction of a work, to withdraw from circulation or control the publication or distribution of a work, and any similar right, existing under judicial or statutory law of any country in the world, or under any treaty, regardless of whether or not such right is called or generally referred to as a "moral right."

4.4    Related Rights.    To the extent that Consultant owns or controls (presently or in the future) any patent rights, copyright rights, mask work rights, trade secret rights, or any other intellectual property or proprietary rights that may block or interfere with, or may otherwise be required for, the exercise by Company of the rights assigned to Company under this Agreement (collectively, *"Related Rights"*), Consultant hereby grants or will cause to be granted to Company a non-exclusive, royalty-free, irrevocable, perpetual, transferable, worldwide license (with the right to sublicense) to make, have made, use, offer to sell, sell, import, copy, modify, create derivative works based upon, distribute, sublicense, display, perform and transmit any products, software, hardware, methods or materials of any kind that are covered by such Related Rights, to the extent necessary to enable Company to exercise all of the rights assigned to Company under this Agreement.

5.    **CONFIDENTIAL INFORMATION**

For purposes of this Agreement, *"Confidential Information"* means and will include: (i) any information, materials or knowledge regarding Company and its business, financial condition, products, programming techniques, customers, suppliers, technology or research and development that is disclosed to Consultant or to which Consultant has access in connection with performing Services; (ii) the Consultant Work Product; and (iii) the terms and conditions of this Agreement.    Confidential Information will not include any information that: (a) is or becomes part of the public domain through no fault of Consultant; (b) was rightfully in Consultant's possession at the time of disclosure, without restriction as to use or disclosure; or (c) Consultant rightfully receives from a third party who has the right to disclose it and who provides it without restriction as to use or disclosure.    Consultant agrees to hold all Confidential Information in strict confidence, not to use it in any way, commercially or otherwise, except in performing Services, and not to disclose it to others. Consultant further agrees to take all actions reasonably necessary to protect the confidentiality of all Confidential Information including, without limitation, implementing and enforcing procedures to minimize the possibility of unauthorized use or disclosure of Confidential Information.

6.    **WARRANTIES**

6.1    No Pre-existing Obligations.    Consultant represents and warrants that Consultant has no pre-existing obligations or commitments (and will not assume or otherwise undertake any obligations or commitments) that would be in conflict or inconsistent with or that would hinder Consultant's performance of its obligations under this Agreement.

6.2    Performance Standard.    Consultant represents and warrants that Services will be performed in a thorough and professional manner, consistent with high professional and industry standards by individuals with the requisite training, background, experience, technical knowledge and skills to perform Services.

3

6.3   Non-infringement.   Consultant represents and warrants that the Consultant Work Product will not infringe, misappropriate or violate the rights of any third party, including, without limitation, any Intellectual Property Rights or any rights of privacy or rights of publicity, except to the extent any portion of the Consultant Work Product is created, developed or supplied by Company or by a third party on behalf of Company.

6.4   Competitive Activities.   During the term of this Agreement, Consultant will not, directly or indirectly, in any individual or representative capacity, engage or participate in or provide services to any business that is competitive with the types and kinds of business being conducted by Company.

6.5   Non-Solicitation of Personnel.   During the term of this Agreement and for a period of one (1) year thereafter, Consultant will not directly or indirectly solicit the services of any Company employee or consultant for Consultant's own benefit or for the benefit of any other person or entity.

6.6   Agreements with Consultant Personnel. Consultant represents and warrants that all Consultant Personnel who perform Services are and will be bound by written agreements with Consultant under which: (i) Consultant owns or is assigned exclusive ownership of all Consultant Work Product; and (ii) Consultant Personnel agree to limitations on the use and disclosure of Confidential Information no less restrictive than those provided in Section 5.

7.   INDEMNITY

Consultant will defend, indemnify and hold Company harmless from and against all claims, damages, liabilities, losses, expenses and costs (including reasonable fees and expenses of attorneys and other professionals) arising out of or resulting from:

(a)   any action by a third party against Company that is based on a claim that any Services performed under this Agreement, or the results of such Services (including any Consultant Work Product), or Company's use thereof, infringe, misappropriate or violate such third party's Intellectual Property Rights; and

(b)   any action by a third party against Company that is based on any act or omission of Consultant or any Consultant Personnel that results in: (i) personal injury (or death) or tangible or intangible property damage (including loss of use); or (ii) the violation of any statute, regulation or ordinance.

8.   TERM AND TERMINATION

8.1   Term.   This Agreement will commence on the Effective Date and, unless terminated earlier in accordance with the terms of this Agreement, will remain in force and effect for as long as Consultant is performing Services pursuant to a Statement of Work for 1 year, with an option to extend the term 3 months or longer upon agreement by both parties.

8.2   Termination for Breach.   Either party may terminate this Agreement (including all Statements of Work) if the other party breaches any material term of this Agreement and fails to cure such breach within thirty (30) days following written notice thereof from the non-breaching party.

8.3   Termination for Convenience.   Company may terminate this Agreement (including all Statements of Work) at any time, for any reason or no reason, upon at least ten (10) days written notice to Consultant.   Company may also terminate an individual Statement of Work at any time, for any reason or no reason, upon at least ten (10) days written notice to Consultant.

8.4   Effect of Termination.   Upon the expiration or termination of this Agreement for any reason: (i) Consultant will promptly deliver to Company all Consultant Work Product, including all work in progress on any Consultant Work Product not previously delivered to Company, if any; (ii) Consultant will promptly deliver to Company all Confidential Information in Consultant's possession or control; and (iii) Company will pay Consultant any accrued but unpaid fees due and payable to Consultant pursuant to Section 2.

8.5   Survival.   The rights and obligations of the parties under Sections 2, 3.2, 3.3, 4, 5, 6.3, 6.5, 6.6, 7, 8.4, 8.5 and 9 will survive the expiration or termination of this Agreement.

4

## 9.   GENERAL

**9.1**   Assignment.  Consultant may not assign or transfer this Agreement, in whole or in part, without Company's express prior written consent.  Any attempt to assign this Agreement, without such consent, will be void.  Subject to the foregoing, this Agreement will bind and benefit the parties and their respective successors and assigns.

**9.2**   No Election of Remedies.    Except as expressly set forth in this Agreement, the exercise by Company of any of its remedies under this Agreement will not be deemed an election of remedies and will be without prejudice to its other remedies under this Agreement or available at law or in equity or otherwise.

**9.3**   Equitable Remedies.  Because the Services are personal and unique and because Consultant will have access to Confidential Information of Company, Company will have the right to enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief, without having to post a bond or other consideration, in addition to all other remedies that Company may have for a breach of this Agreement at law or otherwise.

**9.4**   Attorneys' Fees.  If any action is necessary to enforce the terms of this Agreement, the substantially prevailing party will be entitled to reasonable attorneys' fees, costs and expenses in addition to any other relief to which such prevailing party may be entitled.

**9.5**   Governing Law.  This Agreement will be governed by and construed in accordance with the laws of the State of California, excluding its body of law controlling conflict of laws.  Any legal action or proceeding arising under this Agreement will be brought exclusively in the federal or state courts located in the Northern District of California and the parties irrevocably consent to the personal jurisdiction and venue therein.

**9.6**   Severability.  If any provision of this Agreement is held invalid or unenforceable by a court of competent jurisdiction, the remaining provisions of this Agreement will remain in full force and effect, and the provision affected will be construed so as to be enforceable to the maximum extent permissible by law.

**9.7**   Waiver.   The failure by either party to enforce any provision of this Agreement will not constitute a waiver of future enforcement of that or any other provision.

**9.8**   Notices.  All notices required or permitted under this Agreement will be in writing, will reference this Agreement, and will be deemed given: (i) when delivered personally; (ii) one (1) business day after deposit with a nationally-recognized express courier, with written confirmation of receipt; or (iii) three (3) business days after having been sent by registered or certified mail, return receipt requested, postage prepaid. All such notices will be sent to the addresses set forth above or to such other address as may be specified by either party to the other party in accordance with this Section.

**9.9**   Entire Agreement.    This Agreement, together with all Statements of Work, constitutes the complete and exclusive understanding and agreement of the parties with respect to its subject matter and supersedes all prior understandings and agreements, whether written or oral, with respect to its subject matter.  No term of any Statement of Work will be deemed to amend the terms of this Agreement unless a Statement of Work references a specific provision in this Agreement and provides that the Statement of Work is amending only that specific provision of this Agreement and only with respect to Services performed pursuant to such Statement of Work.  Any waiver, modification or amendment of any provision of this Agreement will be effective only if in writing and signed by the parties hereto.

**9.10**   Counterparts.   This Agreement may be executed in counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

**COMPANY:**

By: _____

Name: __Vasanth Jayaraman__

Title: __Chief Operating Officer__

Date: __12-28-15__

Sales Representative: __Tanyu__

**CONSULTANT:**

By: _____

Name: _____

Title: __EMPLOYEE__

Date: __12-28-15__

6

**EXHIBIT A**

**STATEMENT OF WORK**

This Statement of Work is issued under and subject to all of the terms and conditions of the Consulting Agreement dated as of _12-28-15_ (Effective Date), between **Vibrant America, LLC**, of 1021 Howard Ave Suite B, San Carlos, CA 94070 ("*Company*") and ████████████████ ("*Consultant*").

**1. DESCRIPTION OF SERVICES:**

Apportioning the specimen into multiple vials specific to whole blood, serum and plasma testing requirements; loading, spinning and unloading the vials in a blood centrifuge machine; maintaining specimen integrity by cooling and packaging the vials in specially designed biohazard shipping containers; ensuring proper patient identification on vials and requisition forms; providing accurate and current insurance and billing information; and coordinating shipment pickup.

**2. PAYMENT TERMS**

| | |
|---|---|
| Payment Rate: | $ _15_ /hour |
| Start Date: | _12/28/2015_ |
| Hours/ week: | As needed by the Company |
| Location: | Vibrant America LLC, 1021 Howard Ave San Carlos 94070 |

**3. OTHER TERMS: EXPENSES ARE NOT PAYABLE BY VIBRANT UNLESS SPECIFICALLY STATED HERE.**

AGREED AS OF _12_ / _28_ , 2015

**COMPANY:**

By: _____

Name: Vasanth Jayaraman

Title: Chief Operating Officer

Date: _12 - 28 - 15_

**CONSULTANT:**

By: ████████████

Name: ████████████

Title: _EMPLOYEE_

Date: _12-28-15_

EXHIBIT B



**Vibrant**America
**Clinical Laboratory**

1021 Howard Avenue, Suite B
San Carlos, California 94070
1 (866) 364-0963 | www.Vibrant-America.com

Date: 12·28·15
Account Number:

**Phlebotomy Services Agreement for:**

This letter, acknowledged on (date) 12·28·15 will confirm our understanding regarding fees to be paid by Vibrant America Clinical Lab ("**VACL**") to _____ ("**Phlebotomist**") for specimens drawn and processed for shipment by Phlebotomist and sent to VACL for Testing.  This agreement shall be effective upon the signature date by an authorized VACL official.  VACL and Phlebotomist hereby agree as follows:

1.  In consideration of the processing and handling services provided by Phlebotomist including, as appropriate: apportioning the specimen into multiple vials specific to whole blood, serum and plasma testing requirements; loading, spinning and unloading the vials in a blood centrifuge machine; maintaining specimen integrity by cooling and packaging the vials in specially designed biohazard shipping containers; ensuring proper patient identification on vials and requisition forms; providing accurate and current insurance and billing information; and coordinating shipment pickup (the "Process and Handling Services").

    VACL shall pay Phlebotomist a $ 15 .00 per specimen fee (the "Process and Handling Fee") for each specimen collected by Phlebotomist and sent to VACL for Testing by VACL.

    VACL shall pay Phlebotomist a fee of $ 15 .00 per specimen (the "Collection Fee") for phlebotomy services and related services provided by Phlebotomist in collecting the specimen (the "Collection Services") by drawing blood through venipuncture as defined by the procedure in the Medicare Claims Processing Manual.

    In summary, the total reimbursement for the Collection Services and the Process and Handling Services will be $ 15 .00 per specimen.  Phlebotomist hereby represents that the amounts charged herein are similar to amounts charged by Phlebotomist to other esoteric laboratories for similar services.

    VACL shall pay Phlebotomist appropriate Process and Handling Fees and Collection Fees (collectively, the "Fees") on a monthly basis, upon receipt of a monthly log list, invoice or statement from Phlebotomist which includes the names and date of birth of each patient, ordering provider and the date when each specimen was collected.  Checks are processed once a month, the last day of the month.  Please send the monthly invoice by the 1st, but no later than the 5th of the month for the previous months processing and handling and collection services.  Sent to: Attn:  Lab Services, by email to labservices@Vibrant-America.com or fax (650) 508-8260.

Page 1

VA-LSA V101152015



**Vibrant**America
**Clinical Laboratory**

1021 Howard Avenue, Suite B
San Carlos, California 94070
1 (866) 364-0963 | www.Vibrant-America.com

14.    Please sign and submit this agreement along with a completed W9 form to: Vibrant America Clinical Lab, 1021 Howard Avenue, Suite B, San Carlos, CA 94070, or email Support@Vibrant-America.com. If you have any questions please call 650-830-5569.

A fully executed copy of the agreement will be provided.

ACCEPTED AND AGREED TO AS OF THE DATE BELOW

_____
Authorized Signature

12/28/15
Date Signed

_____
Printed Name

_____
Phlebotomy Company Name (if applicable)

_____
Indicate your fax or email address to receive a copy

VIBRANT AMERICA CLINICAL LABORATORY

_____
Signature

_____/_____/_____
Effective Date

Vasanth Jayaraman
Chief Operating Officer
Vibrant America, LLC

VA-LSA V101152015

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized officers or agents, all as of the date first above written.

Laboratory:

**Vibrant America Clinical Lab**

By:

Name: _Vasanth Jayaraman_

Title: _COO_

Practice: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

By: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Name: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Title: _Medical Director_

-4-



## PHLEBOTOMY SERVICES AGREEMENT

This PHLEBOTOMY SERVICES AGREEMENT (the "Agreement") is entered into by and between **Vibrant America Clinical Lab** (hereinafter "Laboratory") and ▇▇▇▇▇ (hereinafter "Practice") effective as of the  28  day of  December , 2015 (the "Effective Date").

### W I T N E S S E T H:

WHEREAS, Laboratory operates an independent laboratory and provides laboratory services to physician practices; and

WHEREAS, Practice operates a medical practice located at ▇▇▇▇▇▇ (the "Office"); and

WHEREAS, Laboratory is in need of certain phlebotomy services (the "Services"), so that blood and other specimens can be sent to Laboratory for testing;

WHEREAS, the Services must be performed on Laboratory's behalf so that blood and other specimens can be sent to Laboratory, and the Services could be performed at the Office; and

WHEREAS, it would be inconvenient for Laboratory to station a Laboratory staff person at the Office or require a Laboratory staff person to regularly visit to office to perform these necessary Services; and

WHEREAS, Practice has Collectors (the "Collectors") working in the Office and who could be made available to Laboratory for the performance of the same Services that would be provided by a Laboratory staff person if Laboratory were to station such staff at the Office; and

WHEREAS, Laboratory desires to obtain the services of the Collectors to perform such Services that would have been provided by its own staff if it were feasible for Laboratory to station its own staff at the Office; and

WHEREAS, Laboratory and Practice desire to enter into an arrangement whereby Laboratory may engage the Practice's Collectors to provide Services on a part-time basis as independent contractors, and compensate such Collectors directly for the Services;

NOW, THEREFORE, for and in consideration of the promises and the mutual covenants and agreements contained herein, the receipt and adequacy of which are now and forever confessed, the parties hereto agree as follows:

1.      Contracting of Collectors.  Upon the request of Laboratory, Practice shall allow the Laboratory to engage one or more Practice Collectors, on an as-needed basis, as independent contractors, to perform the Services.   Practice shall ensure that any Collectors provided to Laboratory hereunder do not perform Services for the Practice during the time periods when they are providing Services to Laboratory. Practice shall ensure that any Collectors providing Services to Laboratory make separate, complete, and accurate records of the time such Collectors spend providing the Services to Laboratory, and such time shall not include any time Collectors provided



## EXHIBIT A

## ACKNOWLEDGEMENT

The undersigned acknowledges that he/she has reviewed the attached Phlebotomy Services Agreement (the "Agreement") and agrees to abide by the terms of the Agreement in fulfilling his/her services to Laboratory under the Agreement. More specifically, the undersigned agrees and understands that he/she shall not provide any services that are billed to Laboratory under the Agreement other than the phlebotomy services for specimens that will sent to Laboratory for testing, without first obtaining the prior authorization of Laboratory. The undersigned agrees to maintain an accurate log of all time spent providing such services and to deliver such log to Laboratory as directed by Laboratory. In addition, the undersigned agrees to inform Laboratory if the Practice requests the undersigned to provide additional services that are to be charged to Laboratory.

The undersigned acknowledges that he/she has had the opportunity to review this Acknowledgement and the Agreement, and ask any questions that he/she may have regarding these documents and his/her services.

_____
Signature

_____
Printed Name

_12-23-15_____
Date

5

# EXHIBIT C



WELLS FARGO
Wells Fargo Bank, N.A.
California
wellsfargo.com

VIBRANT AMERICA LLC
1116 Tournament Dr.
Hillsborough, CA. 94010-7118
650-477-2206

The Lord is
my strength
and my song.
Exodus 15:2

1778

04-10-2016

Pay to the
Order of

Three hundred forty five only

$ 345.00

For MARCH - PHLEBOTOMY

# EXHIBIT D

# Vibrant America  Panels

## Cardiovascular Health

| Tests | CPT | Medicare Fee |
|---|---|---|
| **Lipid Panel** | 80061 | $18.22 |
| **Apolipoproteins** | | |
| Apo A-1 | 82172 | $21.09 |
| Apo B | 82172 | $21.09 |
| **Inflammation** | | |
| Lp-PLA2 | 83698 | $46.19 |
| Homocysteine | 83090 | $22.95 |
| hs-CRP | 86141 | $17.27 |
| Oxidized LDL | 83516 | $15.70 |
| Troponin | 84484 | $18.84 |
| Myeloperoxidase | 83876 | $46.19 |
| **Myocardial Stress** | | |
| NT-proBNP | 83880 | $46.19 |
| ST2 | 83006 | $29.93 |
| **Lipoprotein Markers** | | |
| sd-LDL | 83701 | $33.10 |
| Lp(a) | 83695 | $17.27 |
| **Fatty Acids** | | |
| Omega 3 & 6 | 82777 | $29.93 |
| **CoQ10** | 83789 | $24.58 |
| **Total** | | **$408.54** |

## Women's Health

| Tests | CPT | Medicare Fee |
|---|---|---|
| Cortisol | | |
| Estradiol | 82670 | $19.21 |
| LH | 83002 | $12.73 |
| FSH | 83001 | $12.77 |
| Progesterone | 84270 | $14.94 |
| Total Testosterone | 84403 | $28.54 |
| SHBG | 84270 | $14.94 |
| **Anemia and Iron Deficiency** | | |
| Folate | 82746 | $20.82 |
| Vitamin B12 | 82607 | 21.35 |
| CBC | 85025 | $10.58 |
| Magnesium | 83735 | $9.11 |
| TIBC | 83550 | $9.53 |
| **Diabetes, Weight Management, Diabetes** | | |
| Leptin | 82397 | $19.22 |
| Ferritin | 82728 | $18.54 |
| Magnesium | 83735 | $9.11 |
| TSH | 84443 | $22.41 |
| Adiponectin | 83516 | $10.27 |
| **Total** | | **$254.07** |

| | | |
|---|---|---|
| **Both Panels** | | **$653.50** |
| (Minus one duplicate test) | | |

# EXHIBIT E

# V078407

V078407    V078407    V078407

V078407    V078407    V078407

**VibrantAmerica**

ALL SECTIONS ARE REQUIRED. MISSING INFORMATION WILL DELAY RESULTS

Signature

COLLECTION                    PROVIDER ELECTED CUSTOM PANELS

## Celiac & Nutrition [all]
Celiac & Gluten Sensitivity
- Vibrant™ Anti-tTG IgA†
- Vibrant™ Anti-tTG IgG†
- Vibrant™ Anti-tTG IgA†
- Vibrant™ Anti-Gliadin IgG†
- Total IgA

### Anemia
- Ferritin
- Iron
- Fe/TIBC
- Transferrin

### Nutrition
- Folate
- Vitamin D
- Vitamin B12

☐ **Vibrant Wheat Zoomer™†**
CASH PAY ONLY

☐ **Food Intolerance Profile**

☐ **Upper Respiratory Disorder Profile**

## Connective Tissue Panel [all]
☐ Rheumatoid Arthritis
- RF IgM
- Anti-CCP3 IgG and IgA
- hs-CRP
☐ ANA IFA Panel†
☐ ENA Profile

☐ **Cardiac Health Panel [all]**
☐ Lipids
- Cholesterol
- LDL Direct
- HDL Direct
- Triglycerides
☐ Apolipoproteins
- Apo A-1   Apo-B
☐ Inflammation
- hs-CRP   Homocysteine
- hsCRP   oxLDL
- Fibrinol   MPO†
☐ Cardiac/Lipid Direct
- LDL   sdLDL
☐ Lipoprotein Markers
☐ Fatty Acids
- Omega-3 / 6

## Metabolic [all]
☐ Glycemic Control
- Glucose   HbA1c
- Fructosamine   C-Peptide
☐ Insulin Resistance
☐ Beta Cell Function

## Comprehensive Metabolic
☐ Electrolytes
☐ Liver
- ALT   AST
- Bili Total   Bili Direct
- Albumin   Total Protein
- GGT   LDH
☐ Kidney
- Creatinine   BUN
- Cystatin C   Calcium
- Chloride   Bicarbonate
☐ Renal [all]