UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA, *ex rel.*
STF, LLC, et al.,

                    Plaintiffs,

        v.

VIBRANT AMERICA, LLC,

                    Defendant.

Case No.  16-cv-02487-JCS

**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS AND VACATING MOTION HEARING**

Re: Dkt. No. 58

## I.    INTRODUCTION

This whistleblower action is brought under the federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, and under California state law, by Plaintiff-Relator STF, LLC ("Relator") on behalf of the United States and the State of California.  Relator's claims are based on alleged kickback schemes used by Defendant Vibrant America, LLC ("Vibrant") to defraud Medicare, Medicaid and private insurers.  The United States and the State of California declined to intervene in this matter on February 14, 2020 and March 6, 2020, respectively.  Dkt. No. 45.  Presently before the Court is Vibrant's Motion to Dismiss ("Motion"), in which it argues that all of the claims in Relator's complaint should be dismissed with prejudice for failure to state a claim under Rule 12(b)(6) and failure to meet the pleading standards of Rule 9(b) of the Federal Rules of Civil Procedure.  The Court finds that the Motion is suitable for determination without oral argument and therefore vacates the motion hearing set for August 21, 2020 at 9:30 a.m.  The Case Management Conference set for the same date will be held at 2:00 p.m. instead of the originally scheduled time of 9:30 a.m.  For the reasons stated below the Motion is GRANTED in part and

United States District Court
Northern District of California

DENIED in part.[1]

## II.    BACKGROUND

### A.    Complaint

Relator STF, LLC is a limited liability company "whose members are involved in the healthcare industry."  Complaint ¶ 10. In its complaint, Relator alleges that Vibrant is a laboratory company based in San Carlos, California.  *Id.*  ¶¶ 8, 11. According to Relator, Vibrant is engaged in two types of kickback schemes:  1) a scheme involving "sham phlebotomy contracts with physicians' family members and staff members," who receive kickbacks for referrals in the form of "well above market and unlawful 'Process and Handling' and 'Collection' fees . . . for each blood specimen physicians send to Vibrant" (hereinafter, "processing fee scheme"); and 2) a scheme where Vibrant "promises to cap patient deductible and/or copayments at $25 for physicians' privately insured patients[,]" which is attractive to physicians because  "it allows them to attract and retain patients by promising to perform all lab testing for no more than $25" (hereinafter, "waiver scheme").  *Id.* ¶¶ 2-4.  Relator alleges that these schemes are "designed to: (1) 'pull through' higher-paying Medicare and Medicaid business to Defendant, (2) entice Medicare, Medicaid, and privately insured patients to seek treatment from and/or continue to receive treatment from physicians whose family and staff members have illegal kickback arrangements with Vibrant, and (3) induce physicians to order excessive numbers of tests from Vibrant for their Medicare, Medicaid and privately insured patients."  *Id.* ¶ 5.

With respect to the processing fee scheme, Relator alleges that Vibrant sales representatives contact physicians and tell them that "their relatives and staff members can enter into sham contracts with VIBRANT, whereby the family member or staff member is deemed an 'independent contractor[ ]'" and paid "a separate $15 draw fee for each blood specimen drawn and submitted to Vibrant for testing."  *Id.* ¶ 32.  Relator alleges that Vibrant "pays the $15 draw fee irrespective of who actually performs the blood draw[,]" offering the following example:

> [I]n  or  about  December  2015,  Vibrant  pitched  its  scheme  to  a

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

> California physician. When the physician indicated that they did not have staff in the office who would be appropriate to serve as an "independent contractor" phlebotomist, Vibrant suggested that a family member of the physician sign up as an "independent contractor," thereby allowing the physician to receive the draw fees. Vibrant recommended to the physician that it be a family member with a different last name, so as not to raise suspicions. Vibrant ultimately signed an 'independent contractor" agreement with the physician's spouse, who has a different last name and is not a licensed phlebotomist.

*Id.* ¶ 33. According to Relator, this arrangement allows physicians or their medical staff to supplement their income because "physicians are able to direct cash to a family member or pay their staff less, appease their staff, and in some instances, obtain a portion of the medical staff's kickback." *Id.* ¶ 34.

As "direct evidence" of the alleged processing fee scheme, Relator points to Vibrant's "standard 'Phlebotomy Consulting Agreement[,]'" which it uses to set up the independent contractor relationship. *Id*. ¶ 36 & Ex. A (Consulting Agreement). It also provides a signed copy of Vibrant's "standard 'Phlebotomy Services Agreement' . . . , which describes the $15 fee Vibrant pays to the physicians' family member or staff member," referring to it as a "Handling Fee" and a "Collection Fee." *Id*. ¶ 37 & Ex. B ("PSA"). The PSA is signed by Vibrant's CEO, Vasanth Jayaraman on behalf of Vibrant; the name of the individual who entered into the agreement with Vibrant is redacted. *Id*., Ex. B. Under the PSA, the individual is to invoice Vibrant every month by providing a "monthly log list" that "includes the name[ ] and date of birth of each patient, ordering provider and the date when each specimen was collected." *Id*. Finally, Relator attaches to the complaint a copy of a check for $345 from Vibrant, which was allegedly paid to the family member in the example quoted above with the notation "March - Phlebotomy." *Id*. ¶ 38 & Ex. C (check). According to Relator, this family member received the blood draw fee even though she did not perform any blood draws. *Id*.

Relator alleges that Medicare pays a $3 draw fee per patient and that the $15 fee paid by Vibrant is "illegal as it is intended to induce medical assistants and physicians to order laboratory tests." *Id*. ¶ 39. The fact that the "Processing and Handling" and "Collection" fees paid by Vibrant is "many multiples of Medicare's $3 draw fee" by itself "gives rise to an inference of illegal remuneration," Relator alleges. *Id*. ¶ 41. Citing OIG Advisory Opinion 05-08 (discussed

below), Relator alleges that these fees "provide[ ] an obvious financial benefit to the referring physician, and it may be inferred that this benefit would be in exchange for referrals to the Lab." *Id*. ¶ 41 (citation and internal quotations omitted).  It further alleges that Vibrant "presented to Medicare and Medicaid claims for reimbursement of laboratory tests which were neither reasonable nor necessary but were ordered by physicians in exchange for kickbacks."  *Id*. ¶ 42.

Addressing the waiver scheme, Relator  alleges that "[i]n order to induce the referral of additional business, especially government pay business, Vibrant does not charge patients any amount in excess of $25 regardless of the patient's responsibility[,]" agreeing "not to send any patients to collections, even if the $25 is never paid."  *Id*. ¶ 45.  Relator alleges that "[r]egardless of the amount Vibrant bills, and regardless of the amount a patient is ultimately responsible for under their insurance plan, the patient is never charged more than $25."  *Id*.  "Even worse," Relator alleges, "Vibrant instructs physicians to tell their patients to ignore any deductible or co-pay charges."  *Id*. To illustrate the money value of such a waiver, Relator points to two panels offered by Vibrant that are frequently ordered together, the Cardiovascular and Women's Health panels, and the Medicare deductibles for those panels, which total more than $650.  *Id*. ¶ 46 & Ex. Exhibit D (list of panels offered by Vibrant with CPT codes and Medicare deductibles).   Even where patients have private insurance, Relator alleges, the typical deductible for these two panels would be over $130.  *Id*. ¶ 47.

Relator alleges Vibrant "knows this strategy is illegal because it provides a significant. benefit to a referring physician[]" and that "[i]n an effort to conceal its scheme and avoid liability, Vibrant does not list this policy on its website."  *Id*. ¶ 48.  Instead, Relator alleges, "this information is communicated personally by Vibrant Sales Representatives."  *Id.* According to Relator, around April 2016, Tanja Elliott, Vibrant's southern California Sales Representative, "explained this policy to a southern California physician."  *Id*.  Relator alleges that "[w]hile Vibrant loses money on uncollected patient deductible and co- payments, it more than makes up the difference with the profits it earns on the Medicare and Medicaid referrals from doctors, which are obtained through Vibrant's marketing scams."  *Id*. ¶ 49.

Based on these allegations, Relator asserts two claims under the FCA: 1)  a claim for

4

presenting false claims in violation of 31 U.S.C. § 3729(a)(1)(A)  (Claim One); and 2) a claim for making or using false records or statements material to payment or approval of false claims in violation of 31 U.S.C. § 3729(a)(1)(B) (Claim Two).  *Id.* ¶¶ 54-62.  It also asserts two claims under the CFCA that mirror the FCA claims: 1)  a claim for presenting false claims in violation of Cal. Gov't Code section 12651(a)(1) (Claim Seven); and 2) a claim for making or using false records or statements to obtain payment of approval of false claims in violation of Cal. Gov't Code 12651(a)(2) (Claim Eight).  In support of these claims, Relator points to guidance provided by the federal Department of Health and Human Services, Office of the Inspector General ("OIG"), which "has issued various advisory opinions regarding indicia of illicit schemes that providers have employed to defraud Medicare."  *Id.* ¶ 21.  In particular, it points to OIG Advisory Opinion No. 05-08, issued in June 2005, in which it was found that "payments by a laboratory to referring physicians of $6 per day for 'collection of blood samples,' likely constituted 'prohibited remuneration under the anti-kickback statute.'"  *Id.* ¶ 22 (quoting OIG Advisory Opinion No. 05-08 at pp. 1-2).

Relator also cites a 2014 OIG Special Fraud Alert that "described aspects of specimen processing arrangements that evidence unlawful practices[,]" including "(1) payment that exceeds fair market value for services actually rendered by the party receiving the payment; (2) payment that is made directly to the ordering physician rather than to the ordering physician's group practice, which bears the cost of collecting and processing the specimen; and (3) payment that is made on a per-test, per-patient, or other basis that takes into account the volume of referrals.  *Id.* ¶ 26 (citing 2014 Special Fraud Alert, pp. 4-5).  According to Relator, "[t]hese statements are consistent with prior Advisory opinions, long notifying the industry that giving anything of value not paid for at fair market value gives rise to an inference that the gift is offered to induce business and is therefore a kickback."  *Id.* ¶ 27 (citing OIG Special Fraud Alert: Arrangements for the Provision of Clinical Laboratory Services (issued October 1994)).

Finally, Relator contends "California law is equally clear" on this question, citing a recent notice by the California Department of Public Health addressing scenarios which likely constitute unlawful inducement under California's kickback statute (Cal. Bus. & Prof. Code § 650),

including one in which a laboratory pays an employee of a physician as an "independent" phlebotomist to collect samples for the physician's patients.  *Id.* ¶ 28 (quoting https://www.cdph.ca.gov/ programs/ lfs/ Documents/CLTAC%20Non-Compliance%20 Inducement %20letter.pdf (last visited April 15, 20 16)).

Relator also asserts four claims under California's Insurance Fraud Prevention Act ("IFPA"):  1) a claim for violation of Cal. Ins. Code § 1871.7(a) based on the employment of runners, cappers, steerers, or other persons to procure patients for the purpose of submitting a claim to that patient's insurance carrier (Claim Three); 2) a claim for violation of Cal. Ins. Code § 1871.7(b) and Cal. Penal Code § 550(a)(1) based on the presentment of false claims for reimbursement of tests (Claim Four);  3) a claim for violation of Cal. Ins. Code § 1871.7(b) and Cal. Penal Code § 550(a)(5)  based on making a writing in support of a false claim (Claim Five); and 4) a claim for violation of Cal. Ins. Code § 1871.7(b) and Cal. Penal Code § 550(a)(6) based on making a false claim for payment of a health benefit (Claim Six).

**B.   State and Federal Agency Guidance[2]**

**1. 1994 Special Fraud Alert**

OIG Special Fraud Alerts address "specific trends of health care fraud and certain practices of an industry-wide character" and are distributed directly to the health care provider community. Publication of OIG Special Fraud Alerts, 59 FR 65372, 65373 ("1994 Special Fraud Alert").   The 1994 Special Fraud Alert addresses violations of the Medicare and Medicaid anti-kickback statute, 42 U.S.C. § 1320a-7b(b), which "penalizes anyone who knowingly or willfully solicits, receives, offers or pays remuneration in cash or in kind to induce, or in return for:  . . . [r]eferring an

---

[2] Vibrant asks the Court to take judicial notice of the agency guidance upon which Relator relies in its complaint, namely, OIG Advisory Opinion No. 05-08, the 2014 OIG Special Fraud Alert, the 1994 Special Fraud Alert, and the California Department of Health notice.  *See* Request for Judicial Notice ("RJN"), Exs. B-E.  Because Relator does not challenge the authenticity of these documents and relies upon them in its complaint, the Court concludes that it may consider them in evaluating the sufficiency of the pleadings under Rule 12(b)(6) under the doctrine of incorporation.  *See Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002). Vibrant also asks the Court to take judicial notice of two documents published by the Centers for Medicare and Medicaid Services on the basis that they are published on government websites. RJN (citing *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 999 (9th Cir. 2010) & Exs. A, F.  As these documents are subject to judicial notice under Rule 201 of the Federal Rules of Evidence that request is granted.

United States District Court
Northern District of California

individual to a person for the furnishing, or arranging for the furnishing, of any item or service payable under the Medicare or Medicaid program[.]" *Id.* It addresses violations based on waivers of copays and deductibles, as well as provision of phlebotomy services to physicians.

With respect to the practice of waiving copays and deductibles, the 1994 Special Fraud Alert explains that this practice by "charge-based providers, practitioners or suppliers is unlawful because it results in (1) false claims, (2) violations of the anti-kickback statute, and (3) excessive utilization of items and services paid for by Medicare." *Id.* at 65374. It states that the Anti-Kickback Statute "makes it illegal to offer, pay, or receive anything of value as an inducement to generate business payable by Medicare or Medicaid" and that "[w]hen providers, practitioners or suppliers forgive financial obligations for reasons other than genuine financial hardship of the particular patient, they may be unlawfully inducing that patient to purchase items or services from them." *Id.* It notes, however, that providers may forgive copayments and deductibles "in consideration of a particular patient's financial hardship" so long as this exception is not used routinely and is used only "occasionally to address the special financial needs of a particular patient." *Id*. at 65375.

As to the provision of phlebotomy services to physicians, the 1994 Special Fraud Alert explains that "[s]ince the physician, not the patient, generally selects the clinical laboratory, it is essential that the physician's decision regarding where to refer specimens is based only on the best interests of the patient." *Id*. at 65377. It continues, "[w]henever a laboratory offers or gives to a source of referrals anything of value not paid for at fair market value, the inference may be made that the thing of value is offered to induce the referral of business." *Id.* The alert notes that the OIG "has become aware of a number of practices engaged in by clinical laboratories and health care providers that implicate the anti-kickback statute in this manner." *Id*. at 65377. It specifically addresses the provision of phlebotomy services to physicians, offering the following guidance:

> When permitted by State law, a laboratory may make available to a physician's office a phlebotomist who collects specimens from patients for testing by the outside laboratory. While the mere placement of a laboratory employee in the physician's office would not necessarily serve as an inducement prohibited by the anti-

kickback statute, the statute is implicated when the phlebotomist performs additional tasks that are normally the responsibility of the physician's office staff. These tasks can include taking vital signs or other nursing functions, testing for the physician's office laboratory, or performing clerical services.  Where the phlebotomist performs clerical or medical functions not directly related to the collection or processing of laboratory specimens, a strong inference arises that he or she is providing a benefit in return for the physician's referrals to the laboratory. In such a case, the physician, the phlebotomist, and the laboratory may have exposure under the anti-kickback statute. . . Furthermore, the mere existence of a contract between the laboratory and the health care provider that prohibits the phlebotomist from performing services unrelated to specimen collection does not eliminate the OIG's concern, where the phlebotomist is not closely monitored by his [of her] employer or where the contractual prohibition is not rigorously enforced.

*Id.*

### 2. OIG Advisory Opinion No. 05-08 (June 2005)

In 2005, OIG issued  Advisory Opinion 05-08 ("2005 OIG Advisory Opinion")  in response to a request for guidance from a clinical laboratory that was considering allowing blood draws to be performed at physicians' offices and then picked up by lab personnel and sent to the lab for testing.  2005 OIG Advisory Opinion at p. 2.  The lab submitted claims for blood draws and blood tests to patients' insurers, including Federal health care programs, and was concerned about running afoul of the anti-kickback statute under the proposed arrangement.  Under the proposal, the lab would "(1) provide blood drawing supplies at no charge to the physicians; and (2) pay the physicians a per patient amount for the physicians' services in collecting the blood specimens (collectively, the 'blood draw remuneration')." *Id.*  It was proposed that the payment for drawing blood would be between $3 and $6 per draw, although the payment would be made no more than once each day for each patient. *Id.*  The advisory opinion noted that "Medicare pays $3 per patient encounter for specimen collection fees charged by physicians, independent laboratories, or hospital laboratories for the services and supplies they use in collecting blood samples, payable only to the person or entity that actually extracted the specimen from the patient." *Id.*  According to the advisory opinion, "[t]he Lab states that it wishes to enter into the Proposed Arrangement, because competing laboratories are paying referring physicians to perform blood draws." *Id.*

The OIG opined that this arrangement "would clearly implicate the anti-kickback

United States District Court
Northern District of California

statute[,]" explaining as follows:

> There is a substantial risk that the Lab would be offering the blood draw remuneration to the physicians in exchange for referrals to the Lab. Under the Proposed Arrangement, the physicians could receive up to twice the $3 amount Medicare pays for blood specimen collection, plus any necessary blood-drawing supplies free of charge. Particularly when viewed in the aggregate, this compensation provides an obvious financial benefit to the referring physician, and it may be inferred that this benefit would be in exchange for referrals to the Lab. Where a laboratory pays a referring physician to perform blood draws, particularly where the amount paid is more than the laboratory receives in Medicare reimbursement, an inference arises that the compensation is paid as an inducement to the physician to refer patients to the laboratory, particularly in the circumstances presented here.

> Based on the facts presented here, it appears that the physicians may well be soliciting the blood draw remuneration as a condition of sending new or continued referrals to the Lab. In addition, we cannot exclude the possibility that the Lab may be offering the blood draw remuneration to the physicians with the intent to induce new or continued referrals to the Lab, especially in light of the Lab's representation that the Proposed Arrangement is a reaction to competitors' arrangements to provide such blood draw remuneration to referring physicians. These competitor arrangements similarly may run afoul of the anti-kickback statute.

> Furthermore, the Proposed Arrangement essentially would give the physicians the opportunity to earn a fee otherwise earned by the Lab. Because the physicians would receive a portion of the Lab's reimbursement for blood tests resulting from the physicians' referrals, the physicians have a strong incentive to order more blood tests. As a result, there is a risk of overutilization and inappropriate higher costs to the Federal health care programs. We discern no safeguards in the Proposed Arrangement to rebut the inference or reduce the risk that the blood draw remuneration would be intended to induce referrals.

> Finally, we note that any specimen collection claims submitted by the Lab to Medicare for blood draws performed by the referring physicians would be improper claims and would implicate the Federal False Claims Act, at 31 U.S.C. § 3729, and the Civil Monetary Penalties Law, at section 1128A(a)(1) of the Act. As noted, Medicare pays only the person or entity that actually extracted the specimen from the patient. As such, Medicare rules would prohibit the Lab from billing Medicare for blood collection services rendered by the referring physicians. In addition, while under certain conditions physicians can bill Medicare directly for collecting blood specimens, if the Lab were to pay a physician to perform a blood draw, the physician would be impermissibly "double dipping" if the physician also billed Medicare for that blood draw.

> Accordingly, based on the totality of facts and circumstances, we conclude that the Proposed Arrangement poses a substantial risk of program fraud and abuse.

*Id.* at p. 4.  The OIG noted, however, that "[a]ny definitive conclusion regarding the existence of an anti-kickback violation requires a determination of the parties' intent, which determination is beyond the scope of the advisory opinion process."  *Id.* at p. 5.

### 3.  2014 Special Fraud Alert

In 2014, OIG issued another Special Fraud Alert in which it addressed the lawfulness of compensation paid by laboratories to referring physicians for blood specimen collection, processing, and packaging.  OIG began by noting that it had "issued a number of guidance documents and advisory opinions addressing the general subject of remuneration offered and paid by laboratories to referring physicians," including the 1994 Special Fraud Alert and the 2005 OIG Advisory Opinion. The 2014 Special Fraud Alert states, "[i]n these and other documents, we have repeatedly emphasized that providing free or below-market goods or services to a physician who is a source of referrals, or paying such a physician more than fair market value for his or her services, could constitute illegal remuneration under the anti-kickback statute."  The 2014 Special Fraud Alert was issued to supplement OIG guidance and addressed, *inter alia*, a trend "involving transfers of value from laboratories to physicians that [OIG] believe[d] present[ed] a substantial risk of fraud and abuse under the anti-kickback statute."  In particular, OIG addressed arrangements between labs and physicians "under which clinical laboratories are providing remuneration to physicians to collect, process, and package patients' specimens, explaining:

> Specimen Processing Arrangements typically involve payments from laboratories to physicians for certain specified duties, which may include collecting the blood specimens, centrifuging the specimens, maintaining the specimens at a particular temperature, and packaging the specimens so that they are not damaged in transport. Payments under Specimen Processing Arrangements typically are made on a per-specimen or per-patient-encounter basis and often are associated with expensive or specialized tests.

> . . .

> The anti-kickback statute is implicated when a clinical laboratory pays a physician for services. Whether an actual violation of the statute occurs depends on the intent of the parties—the anti-kickback statute prohibits the knowing and willful payment of such amounts if even one purpose of the payment is to induce or reward referrals of Federal health care program business. This is true regardless of whether the payment is fair market value for services rendered. The probability that a payment is for an illegitimate purpose is increased,

however, if a payment exceeds fair market value or if it is for a service for which the physician is paid by a third party, including Medicare.

When determining the fair market value of a physician's services, a clinical laboratory should consider whether the services for which it may compensate the physician have been, or may be, paid for, including through a bundled payment, by Medicare. Additionally, the laboratory should consider whether payment is appropriate at all; if the services for which the laboratory intends to compensate the physician are paid for by a third party through other means, such as payments intended to reimburse the physician for overhead expenses, any payment by the laboratory to the physician may constitute double payment for the physician's services and, consequently, provide evidence of unlawful intent.

Characteristics of a Specimen Processing Arrangement that may be evidence of such unlawful purpose include, but are not limited to, the following:

- Payment exceeds fair market value for services actually rendered by the party receiving the payment.
- Payment is for services for which payment is also made by a third party, such as Medicare.
- Payment is made directly to the ordering physician rather than to the ordering physician's group practice, which may bear the cost of collecting and processing the specimen.
- Payment is made on a per-specimen basis for more than one specimen collected during a single patient encounter or on a per-test, per-patient, or other basis that takes into account the volume or value of referrals.
- Payment is offered on the condition that the physician order either a specified volume or type of tests or test panel, especially if the panel includes duplicative tests (e.g., two or more tests performed using different methodologies that are intended to provide the same clinical information), or tests that otherwise are not reasonable and necessary or reimbursable.
- Payment is made to the physician or the physician's group practice, despite the fact that the specimen processing is actually being performed by a phlebotomist placed in the physician's office by the laboratory or a third party.

OIG's concerns regarding Specimen Processing Arrangements are not abated when those arrangements apply only to specimens collected from non-Federal health care program patients. Arrangements that "carve out" Federal health care program beneficiaries or business from otherwise questionable arrangements implicate the anti-kickback statute and may violate it by disguising remuneration for Federal health care program business through the payment of amounts purportedly related to non-Federal health care program business. Because physicians typically wish to minimize the number of laboratories to which they refer for reasons of convenience and administrative efficiency, Specimen Processing Arrangements that carve out Federal health care program business may nevertheless be intended to influence physicians' referrals of Federal health care program business to the offering laboratories.

2014 Special Fraud Alert.

### 4. California Department of Public Health Notice

Relator also relies on a notice ("Notice") published on the website of the California Department of Public Health addressing inducements for referrals that violate California's anti-kickback statute, Bus. & Prof. Code § 650. Complaint ¶ 28; RJN, Ex. E.[3] The Notice describes the following unlawful scenarios:

1. A laboratory places phlebotomy personnel in a physician's office. These personnel are either employed by the laboratory or contracted by the laboratory directly or indirectly through a third party. In this scenario, the phlebotomy services are offered solely to the physician's patients and are not available to the public, and the laboratory may or may not pay fair market value to the physician to lease the space occupied by the phlebotomist. This is considered an unlawful inducement, regardless of whether the laboratory is paying fair market value to the physician for the leased space. In exchange for access to phlebotomy services at zero or reduced cost, the physician refers all of the physician's patients to the laboratory; the services are provided solely to the physician's patients and not to the general public. If the laboratory is not paying fair market value to lease the space occupied by the phlebotomist, this is further evidence of an unlawful inducement violation.

2. A laboratory pays an employee of a physician as an "independent" phlebotomist to collect specimens for the physician's patients. After the issuance of the federal OIG Special Fraud Alert issued June 25, 2014, a laboratory has changed its practices and now enters into a contractual arrangement directly with an individual, who is a member of a physician's office staff, to provide phlebotomy services to the laboratory. The individual provides the phlebotomy services on-site in the physician's office. The individual remains an employee of the physician's office and simultaneously receives payments directly from the laboratory as an independent contractor to the laboratory. In some circumstances, the physician reduces the salary or compensation to that individual when such an arrangement is in place. This appears to be an inducement, as the laboratory is conferring a benefit upon the physician by paying a portion of the compensation of the physician's employee. It is an inducement regardless of whether the laboratory is paying fair market value to the physician to lease the space utilized by the phlebotomist.

---

[3] The notice is undated. Relator characterizes the notice as "recent" in its 2016 Complaint, which indicates that the website where the notice was posted was last visited in April 2016. Complaint ¶ 28.

### C.    The Motion

In the Motion, Vibrant argues that all of Relator's claims are insufficiently alleged.  It contends the FCA, CFCA and IFPA claims all fail because both of the alleged schemes involve lawful business activity rather than kickbacks.  In addition, it asserts, these claims sound in fraud and therefore must meet the heightened pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure, which Vibrant contends Relator does not satisfy. Nor does Relator adequately allege the required fraud elements of materiality and scienter, Vibrant asserts.  Vibrant argues the IFPA claims fail for the additional reason that Relator does not have standing under that statute.  Finally, Vibrant contends this case should be dismissed because it is being pursued by a "serial relator" who is not an "insider privy to" the facts on which its claims are based and is the "type of opportunistic, meritless and harmful filing that is supposed to be barred by Rule 9(b)."

## III.    ANALYSIS

### A.    Legal Standards

#### 1.    Rule 12(b)(6)

A complaint may be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim on which relief can be granted.  "The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint." *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).  Generally, a plaintiff's burden at the pleading stage is relatively light.  Rule 8(a) of the Federal Rules of Civil Procedure states that a "pleading which sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).

In ruling on a motion to dismiss under Rule 12(b)(6), the court analyzes the complaint and takes "all allegations of material fact as true and construe[s] them in the light most favorable to the non-moving party." *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  Dismissal may be based on a lack of a cognizable legal theory or on the absence of facts that would support a valid theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  A complaint must "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 562 (2007) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).  "[C]ourts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"  *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (alteration in original).  Rather, the claim must be "'plausible on its face,'" meaning that the plaintiff must plead sufficient factual allegations to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting *Twombly*, 550 U.S. at 570).

        "Ordinarily, a court may look only at the face of the complaint to decide a motion to dismiss."  *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002).  However, under the doctrine of incorporation by reference, a court may look beyond the pleadings to consider documents that were "referenced extensively in the complaint and were accepted by all parties as authentic" without converting a Rule 12(b)(6) motion into a summary judgment motion. *Id.* (citing *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir.1999)).

### 2.  Rule 9(b)

        Rule 9(b) establishes a heightened pleading standard for claims based on fraud.  "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "To satisfy Rule 9(b), a pleading must identify 'the who, what, when, where, and how of the misconduct charged,' as well as 'what is false or misleading about [the purportedly fraudulent] statement, and why it is false.'" *United States ex rel. Cafasso v. Gen. Dynamic Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (alteration in original) (quoting *U.S. ex rel. Ebeid v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010)).   In determining whether allegations of fraud are sufficiently detailed to meet the requirements of Rule 9(b), courts consider the primary purpose of the rule, namely, to "'give adequate notice to an adverse party and enable that party to prepare a responsive pleading.'" *United States ex re. Swobant v. United Healthcare Ins. Co.*, 848

United States District Court
Northern District of California

F.3d 1161, 1180 (9th Cir. 2016) (*Swobant*) (quoting 5A Charles Alan Wright & Arthur R. Miller,

Federal Practice and Procedure § 1298 (3d ed. 2016)).  The rule also "serves 'to deter the filing of

complaints as a pretext for the discovery of unknown wrongs, to protect defendants from the harm

that comes from being subject to fraud charges, and to prohibit plaintiffs from unilaterally

imposing upon the court, the parties and society enormous social and economic costs absent some

factual basis.'"  *Id.* (quoting *Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001)

(internal quotation and citation omitted)).

"Consistent with these requirements . . . [b]road allegations that include no particularized

supporting detail do not suffice . . . but 'statements of the time, place and nature of the alleged

fraudulent activities are sufficient[.]'"  *Id.* (quoting *Wool v. Tandem Computers Inc.*, 818 F.2d

1433, 1439 (9th Cir. 1987)).  The court in *Swobant* explained:

> Because this standard "does not require absolute particularity or a
> recital of the evidence," Wright & Miller, *supra*, § 1298, a complaint
> need not allege "a precise time frame," "describe in detail a single
> specific transaction" or identify the "precise method" used to carry
> out the fraud, *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997).
> The complaint also need not "identify representative examples of
> false claims to support every allegation." [*Ebeid ex rel. United States
> v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010)]. "[I]t is sufficient to
> allege 'particular details of a scheme to submit false claims paired
> with reliable indicia that lead to a strong inference that claims were
> actually submitted.'" *Id.* at 998–99 (quoting *United States ex rel.
> Grubbs v. Ravikumar Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)).

*Id.*

### 3. Statutory Framework

#### a. The Anti-Kickback Statute

The federal Anti-Kickback Statute "prohibits payments in exchange for referrals to federal

healthcare programs," *United States ex rel. Riedel v. Bos. Heart Diagnostics Corp.*, 332 F. Supp.

3d 48, 57 (D.D.C. 2018), specifically making it unlawful to:

> knowingly and willfully offer[ ] or pay[ ] any remuneration (including
> any kickback, bribe, or rebate) directly or indirectly, overtly or
> covertly, in cash or in kind to any person to induce such person to
> refer an individual to a person for the furnishing or arranging for the
> furnishing of any item or service for which payment may be made in
> whole or in part under a Federal health care program.

United States District Court
Northern District of California

42 U.S.C. § 1320a-7b(b)(2)(A). The Ninth Circuit has held that this provision "is violated if 'one purpose of the payment was to induce future referrals . . . even if the payments were also intended to compensate for professional services.'" *United States v. Kats*, 871 F.2d 105, 108 (9th Cir. 1989) (quoting *United States v. Greber*, 760 F.2d 68, 69 (3d Cir.1985)).

### b.   The FCA

"The False Claims Act makes liable anyone who 'knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval,' or 'knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.'" *United States ex rel. Campie v. Gilead Scis.*, 862 F.3d 890, 898-99 (9th Cir. 2017) (quoting 31 U.S.C. § 3729(a)(1)(A), (B)). "A 'claim' includes direct requests for government payment as well as reimbursement requests made to the recipients of federal funds under a federal benefits program." *Id.* (citing 31 U.S.C. § 3729(b)(2)(A); *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016) ("*Escobar*") ("What matters is not the label the Government attaches to a requirement, but whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision.").

Under the theory of "promissory fraud" or "fraud-in-the-inducement," liability may be established under the FCA even if there was not an explicitly false claim. *U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1173 (9th Cir. 2006) ("*Hendow*").  Under this theory, "liability will attach to each claim submitted to the government under a contract, when the contract or extension of government benefit was originally obtained through false statements or fraudulent conduct." *Id.*  Where an FCA claim is based on promissory estoppel, the essential elements of the claim are: "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *Id.* at 1174.

Because the FCA is an anti-fraud statute, complaints brought under the FCA must fulfill the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure.  *Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001).

### c.   The CFCA

Under the CFCA, a violation occurs when a person "[k]nowingly presents or causes to be

16

presented a false or fraudulent claim for payment or approval[,]"or "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim." California Government Code sections 12651(a)(1) & (a)(2).  "Where, as is the case here, 'the statutory provisions of the federal FCA and California FCA are the same, courts apply the same analysis to federal and California FCA claims.'" *United States v. Crescendo Bioscience, Inc*., No. 16-CV-02043-TSH, 2020 WL 2614959, at *6 (N.D. Cal. May 23, 2020) (quoting *United States v. Safran Grp., S.A.*, 2017 U.S. Dist. LEXIS 8408, at *13, 2017 WL 235197 (N.D. Cal. Jan. 19, 2017) (citation omitted)).

> ### d.  The California IFPA

The California IFPA is "specifically tailored toward preventing and punishing the making of fraudulent claims to insurance companies." *State of California ex rel. Metz v. CCC Information Services, Inc*., 149 Cal. App. 4th 402, 413 (2007) (citation omitted).   Under section 1871.7(a),  it is "unlawful to knowingly employ runners, cappers, steerers, or other persons to procure clients or patients to perform or obtain services or benefits . . . or to procure clients or patients to perform or obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured individual or his or her insurer." Cal. Ins. Code § 1871.7(a).  Subdivision (b), authorizes an action on behalf of the state against "every person" who violates Penal Code sections 549, 550 and 551."

Relator asserts IFPA claims based on alleged violations of Penal Code sections 550(a)(1), (a)(5) and (a)(6).  Those subdivisions of section 550(a) make it unlawful to: "(1) knowingly present or cause to be presented any false or fraudulent claim for the payment of a loss or injury, including payment . . . under a contract of insurance.[;]" "(5) knowingly prepare, make, or subscribe any writing, with the intent to present or use it, or to allow it to be presented, in support of any false or fraudulent claim[;]" or "(6) knowingly make or cause to be made any false or fraudulent claim for payment of a health care benefit."

The IFPA allows for an "interested person" to bring a civil action for a violation of the statute "for the person and for the State of California" and "in the name of the State." Cal. Ins. Code § 1871.7(e)(1).

United States District Court
Northern District of California

### B.   FCA Claims

#### 1.   Whether Claims are Sufficiently Pled

##### a.  Processing Fee Scheme

Vibrant argues that the Processing Fee Scheme is lawful and does not violate the Anti-Kickback Statute or the FCA, emphasizing two aspects of the arrangement that it contends distinguish it from the illegal scenarios described in the agency guidance discussed above: 1) the fees are not merely for "a standard blood draw and collection" but rather cover a "panoply" of services that includes apportioning the blood in vials, spinning the vials in a centrifuge, packaging and labeling the vials and arranging for shipment; and 2) the $15 payment is made to a staff or family member and not to the physician.  It also argues that Relator has not alleged the scheme in sufficient detail to meet the heightened pleading requirements of Rule 9(b).  The Court finds these arguments to be unpersuasive.

Vibrant's argument that its payments are not "bribes" even though they exceed the amount Medicare reimburses physicians for a standard blood draw misses the mark in several respects. First, to the extent Vibrant offers evidence to support its position that the fees it pays are reasonable for the services provided and therefore do not exceed the fair market value,[4] it misapprehends the standards that apply at the pleading stage of the case, which generally do not allow the Court to consider evidence offered to contradict the allegations in the complaint.  Relator has alleged that Vibrant pays a fee that vastly exceeds the normal Medicare reimbursement rate for a blood draw and that it pays the fee even where the contracted "phlebotomists" are not licensed and did not draw the blood themselves, in other words, where the recipients performed *no* services whatsoever.  Drawing all reasonable inferences in favor of Relator, these allegations are sufficient to support an inference that the fee paid by Vibrant exceeds the fair market value of the services

---

[4] In particular, Vibrant points to: 1)  average Medicare billing rates in 2014 for routine venipuncture that it obtained from a "subscription based online database for medical billing codes and information", Motion at 5 n. 1 (citing https://www.findacode.com/tools/code-print.php?set= CPT&c=36415); and 2) evidence that Medicare pays specimen collection fees of between $23.46 and $25.46 to laboratories for the collection of "certain samples for COVID-19 diagnostic testing" that require travel to patients that are homebound or in a skilled nursing facility.  *Id*. (citing https://www.cms.gov/files/document/covid-19-laboratories.pdf. ).

provided.

Nor is there anything in the 2014 Special Fraud Alert that suggests that the OIG was concerned only with scenarios in which laboratories pay fees for a standard blood draw and/or pay more than the fair market value of the services provided in return for such fees.  To the contrary, the OIG addressed the types of violations of the Anti-Kickback Statute that could arise in the context of "Specimen Processing Arrangements [that] typically involve payments from laboratories to physicians for certain specified duties, which may include collecting the blood specimens, centrifuging the specimens, maintaining the specimens at a particular temperature, and packaging the specimens so that they are not damaged in transport."  2014 Special Fraud Alert. Moreover, as described above, the OIG offered a non-exclusive list of the types of features of such arrangements that could indicate an unlawful intent to induce referrals.  While one scenario involved the payment of a fee that "exceeds fair market value for services actually rendered by the party receiving the payment[,]" the 2014 Special Fraud Alert also lists other features of Specimen Processing Arrangements that may indicate that an arrangement is unlawful.  Further, the 2014 Special Fraud Alert explains that while the "probability that a payment is for an illegitimate purpose is increased . . . if a payment exceeds fair market value[,]" a processing fee paid by the laboratory may violate the Anti-Kickback Statute  "regardless of whether the payment is fair market value for services rendered."  2014 Special Fraud Alert.

Two of the examples listed in the 2014 Special Fraud Alert deserve mention here.  First, it points to arrangements where "[p]ayment is made on a per-specimen basis for more than one specimen collected during a single patient encounter or on a per-test, per-patient, or other basis that takes into account the volume or value of referrals."  Here, Relator alleges that Vibrant pays a "separate $15 draw fee for each blood specimen drawn and submitted to Vibrant for testing." Complaint ¶ 32.  This aspect of the processing fee scheme therefore supports an inference of unlawful intent regardless of whether the amount of the payment reflects the fair market value of the services provided.  Second, the 2014 Special Fraud Alert cautions against arrangements where "[p]ayment is made directly to the ordering physician rather than to the ordering physician's group practice, which may bear the cost of collecting and processing the specimen."  While this example

19

United States District Court
Northern District of California

1   is not directly on point, it suggests that the arrangement alleged here is also unlawful to the extent

2   Vibrant pays the fees directly to family or staff members even when they did not perform any of

3   the services, thus leaving the physician's practice to bear the cost of the services.

4          Similarly unpersuasive is Vibrant's argument that its fee processing scheme does not

5   violate the Anti-Kickback Statute because payments for the blood draws are made directly to

6   independent contractors and not to the physicians themselves, relying on *United States v. Chang*,

7   No. CV133772DMGMRWX, 2017 WL 10544289 (C.D. Cal. July 25, 2017)).  Motion at 10.  The

8   undersigned finds, however, that the reasoning in *Chang* is not consistent with the plain language

9   of the Anti-Kickback Statute or the agency guidance discussed above.  In *Chang*, the court found

10  on a motion to dismiss that a laboratory that waived copays of patients referred to it did not state a

11  claim for violation of the Anti-Kickback Statute or the FCA.  2017 WL 10544289, at *8.  The

12  court reasoned that in order to state a claim under either statute the relator was required to allege

13  that the defendant laboratory "offered or paid remuneration to outside physicians to induce those

14  physicians to refer their patients to" it but that instead, the relator had alleged that "the

15  remuneration—waiver or offer of wavier of co-pays—was offered to the *patients*, not to the

16  referring physicians."  *Id*. (citing *Hanlester Network v. Shalala*, 51 F.3d 1390, 1397 (9th Cir.

17  1995) for the proposition that "to find a violation of the AKS' anti-remuneration provision,

18  defendants must have 'knowingly and willfully offered or paid remuneration to induce referrals of

19  program-related business'"; and citing *United States v. Ctr. for Diagnostic Imaging, Inc*., 787 F.

20  Supp. 2d 1213, 1218 (W.D. Wash. 2011) for the proposition that "the [AKS] does not criminalize

21  referrals for services paid for by Medicare or Medicaid—it criminalizes knowing and willful

22  acceptance of remuneration in return for such referrals." (internal quotation and citation omitted)).

23         The undersigned respectfully disagrees with the court's narrow reading of the FCA and the

24  Anti-Kickback Statute in *Chang*.  Neither of the cases cited by the court in support of its

25  conclusion was factually on point or addressed whether a benefit conferred directly on third

26  parties, such as patients in the case of fee waivers or staff or family members in the case of

27  processing fees, can also indirectly confer a benefit on physicians sufficient to support a claim

28  under the Anti-Kickback Statute and the FCA.  Nor did the court in *Chang* address that question.

The undersigned concludes that it can.  The broad language of the Anti-Kickback Statute supports this conclusion, prohibiting payment of "any remuneration (including any kickback, bribe, or rebate) directly *or indirectly*, overtly or covertly, in cash *or in kind* to any person" if it is willful. 42 U.S.C.A. § 1320a-7b(b)(1) (emphasis added).  Likewise, the Ninth Circuit has found that the FCA should be construed broadly.  *See Hooper v. Lockheed Martin Corp*., 688 F.3d 1037, 1048 (9th Cir. 2012) (citing with approval the Fourth Circuit's conclusion in *Harrison v. Westinghouse Savannah River Co*., 176 F.3d 776, 786 (4th Cir. 1999) that "after the 1986 amendments the False Claims Act should be broadly construed" (citing S. Rep. No. 99–345, at 9, reprinted in 1986 U.S.C.C.A.N. at 5274)); *see also*  2014 Special Fraud Alert (addressing "transfers *of value* from laboratories to physicians that [OIG] believe[d] present[ed] a substantial risk of fraud and abuse under the anti-kickback statute") (emphasis added).

Here, Relator specifically alleges that "[b]y ordering tests through Vibrant, physicians are able to direct cash to a family member or pay their staff less, appease their staff, and in some instances, obtain a portion of the medical staff's kickbacks."  Complaint ¶ 34.  The Court finds that these allegations are sufficient to allege that physicians receive remuneration for referring patients to Vibrant under the fee processing scheme for the purposes of the Anti-Kickback Statute.

 The Court also rejects Vibrant's argument that the processing fee scheme is not alleged with particularity under Rule 9(b) because Relator has not alleged with particularity that: 1)  the $15 payments are remuneration to referral sources; or 2) that the payments were made in order to induce referrals.  *See* Motion at 10-13.

With respect to remuneration, Vibrant challenges Relator's allegations in paragraph 34 of the complaint (quoted above) as insufficient because Relator does not identify "which physician practices its allegations relate to or *which*  staff member(s) at those practices were paid less or appeased as a result of this arrangement, much less other supporting particularity, such as *how much less*  the practice paid the staff member or *when*  the practice made compensation adjustments or facts supporting *why* adjustments were made."  *Id*. at 10 (emphasis in original). Even in the case of the example offered by Relator of a physician's wife who allegedly was paid by Vibrant even though she did not perform the blood draws, Vibrant argues that the allegations

are too vague because Relator "fails to identify by name the physician or the spouse or who at Vibrant purportedly suggested to the physician that Vibrant contract with a family member, much less where or how these communications occurred, or specifically what was said by who." *Id*. at 11.  Furthermore, it asserts, the check attached as an exhibit to the complaint is redacted so that it does not show who the check was made out to, making it impossible to determine if the recipient is the wife of a referring physician, as alleged. *Id*.  In addition, Vibrant argues, the allegations are deficient because there are no specific facts to support Relator's allegation that the recipient of the check did not perform the blood draw herself. *Id*.  According to Vibrant, it is left to "blindly defend itself, in direct violation of Rule 9(b)" as a result of Relator's conclusory allegations.

Vibrant's protest rings hollow.  In the Complaint, Relator provides detailed allegations as to the "what" and "how" of the alleged fraudulent scheme, describing the nature of the arrangements between Vibrant and the "independent contractors" and how Vibrant's sales representatives communicate with physicians to set up the sham contracts, including recommending that where family members are signed up as independent contractors they should have a different last name from the physician.  Complaint ¶¶ 32-37, Exs. A- B.  The Complaint and attached contracts also identify who signs the contracts and pays the fees (the COO, Vasanth Jayaraman), how the independent contractors invoice Vibrant, and when and where the invoices should be sent. *Id.*  These allegations are more than sufficient to put Vibrant on notice of the nature of the fraudulent scheme alleged under the standards set forth in *Swobant* .  *See* 848 F.3d at 1180.  The Court further notes that as to the individual whose name is redacted from the exhibits attached to the complaint, Vibrant's argument fails for the additional reason that these are Vibrant's own documents and contain unredacted information sufficient for Vibrant to determine the identity of the individual.  The check, for example, shows the date it was written, the bank account on which it was drawn and the check number.  *See* Complaint, Ex. C.

Vibrant also argues that the processing fee scheme is not pled with particularity because "Relator does not identify with specificity any offer by Vibrant to exchange payments for referrals for tests, and moreover, inducement cannot be inferred from conclusory assertions, such as vaguely pled allegations that: Vibrant paid unlicensed phlebotomists and individuals not

performing blood draws; unnecessary tests were ordered; and Vibrant paid too much for services."
Motion at 12.  Again, Vibrant's arguments are unpersuasive.  As Judge Hixson recently found in a
case involving similar allegations by the same Relator, detailed allegations about the nature of the
processing fee scheme are sufficient to state a claim based on inducement even where  the relator
"hasn't alleged any particular transaction or named a particular physician who sent samples" to the
laboratory."  *United States v. Crescendo Bioscience, Inc*., No. 16-CV-02043-TSH, 2020 WL
2614959, at *9 (N.D. Cal. May 23, 2020).

Vibrant's reliance upon *United States ex rel. Gough v. Eastwestproto, Inc*., No. CV 14-465
DMG (SHX), 2018 WL 6929332 (C.D. Cal. Oct. 24, 2018) ("*Gough*") is also misplaced. In
*Gough*, the relator asserted FCA claims based on an alleged kickback scheme between an
ambulance company and various hospitals where the ambulance company offered cash and gifts to
hospitals in return for Medicare referrals.  2018 WL 6929332 at *3 (C.D. Cal. Oct. 24, 2018). The
court held that the FCA claims were insufficiently pled because the complaint "lack[ed] any
reliable indicia that [the hospital] solicited or received remuneration in exchange for Medicare
referrals to [the ambulance company], or that the alleged kickbacks led to the submission of claims
for reimbursement under Medicare.  *Id*. at *6.  In contrast to the allegations here, where there are
not only detailed allegations about the scheme but also copies of signed contracts and a sample
check paid by Vibrant to an independent contractor, the complaint in *Gough* contained almost no
specific facts to show that the defendant in that case had ever offered cash or gifts to the hospitals
in the first place.  *Id.* at * 6-7.  Therefore, the Court finds that the holding in *Gough* does not
support Vibrant's position.

For these reasons, the Court rejects Vibrant's assertion that Relator's FCA claims based on
the processing fee scheme should be dismissed for failure to meet the requirements of Rule
12(b)(6) and Rule 9(b).

### b.  Waiver Scheme

Vibrant argues that Relator also has not sufficiently alleged any illegal conduct based on
waiver of deductibles and copays, attempting to distinguish the  guidance in the 1994 Special
Fraud Alert on the basis that the waiver alleged here relates to privately insured patients and

United States District Court
Northern District of California

23

because there are no copayments for laboratory services under Medicare.  Motion at 7-8 (citing RJN, Ex. F (Medicare Claims Processing Manual, ch. 16 § 30.2 (Jan. 17, 2020)).  It further asserts that the claims as to this scheme are deficient because the 1994 Special Fraud Alert recognizes that providers can waive copays and deductibles based on financial hardship and Relator has not alleged that the waivers here are based on financial hardship.  *Id.* at 8.  Neither of these arguments is persuasive.

First, Vibrant's reading of the 1994 Special Fraud Alert as covering only waivers of copays or deductibles paid by Medicare and Medicaid patients is incorrect.  While the 1994 Special Fraud Alert offered as an example a scenario in which the laboratory waived charges to Medicare patients, it made clear that the waiver of copays and deductibles may run afoul of the Anti-Kickback Statute because that statute prohibits the transfer of "anything of value" as an inducement for referrals.  To the extent there is any doubt as to whether offering waivers of copays and deductibles for physicians' private insurance patients is something of value that may violate the Anti-Kickback Statute, the 2014 Special Fraud Alert explains why it does.  In particular, in addressing "carve-outs," it states: "Because physicians typically wish to minimize the number of laboratories to which they refer for reasons of convenience and administrative efficiency, Specimen Processing Arrangements that carve out Federal health care program business may nevertheless be intended to influence physicians' referrals of Federal health care program business to the offering laboratories."  While that statement is made in the context of specimen referral arrangements, the same reasoning applies to offers to waive copays and deductibles.

The court in *United States ex rel. Riedel v. Bos. Heart Diagnostics Corp*., reached the same conclusion. 332 F. Supp. 3d 48, 67 (D.D.C. 2018) ("*Boston Heart*").  In that case, the relator asserted FCA claims based on the allegation that the defendant, Boston Heart, "waive[d] physicians' privately insured patients' co-payments and deductibles, so long as the physicians sen[t] all of their lipid-related business—especially the highly profitable Medicare business—to [Boston Heart]."  *Id.* (internal quotations and citation omitted).  The court rejected Boston Heart's argument that the arrangement did not involve kickbacks under the 1994 Special Fraud Alert, reasoning that while that guidance "reference[d] waiver of charges to managed care patients as an

24

'example[ ] of lab services arrangements that may violate the [A]nti-[K]ickback [S]tatute,' it note[d] that this example fits the category of 'cases where the provision of free services results in a benefit to the provider,' and thus, 'the [A]nti-[K]ickback [S]tatute is implicated.'" *Id.* (quoting 1994 Special Fraud Alert, 59 Fed. Reg. at 65,377). The court explained further that the relator's allegations concerning waiver of privately insured patients' co-payments and deductibles "would also implicate the Anti-Kickback Statute because it would constitute the provision of free services, *i.e.*, the waiver of co-payments and deductibles, that result in a benefit to the provider, *i.e.*, by saving the physicians' time not spent on explaining co-payment and deductible charges to patients and providing them an opportunity to market free laboratory testing." *Id.*

Likewise, Judge Hixson concluded in *Crescendo* that the relator sufficiently alleged a kickback scheme based on a laboratory's offer to cap patient payments at $25 for all of the referring physician's patients, reasoning as follows:

> A reasonable reading of that allegation is that Crescendo "does not charge patients any amount in excess of $25," something of "value to both physicians and their patients," "in order to induce the referral of additional business." Defendants make much of the fact that STF does not explicitly draw the line from Crescendo waiving co-pays or deductibles to physicians referring patients. "[STF] presupposes a link," they argue, "and in doing so, asks the Court to fill the gap." Mem. at 18. But the gap is not a large one to fill: no patient likes additional costs; if a lab waives patients' fees and commits to not referring patients to collections, thus allowing physicians to "reassure their patients that they will not be responsible for more than $25," that is something of value to physicians and they might be induced to send more patients to that lab (especially when the lab is paying $15 per sample to boot). *See Bos. Heart*, 332 F. Supp. 3d at 66 . . . . In any event, STF referenced the 1994 Special Fraud Alert, *see* FAC ¶ 53, which advised that "[i]n certain cases, a provider, practitioner or supplier who routinely waives Medicare copayments or deductibles also could be held liable under the Medicare and Medicaid anti-kickback statute," 59 FR at 65374-75; see also *id.* at 65377 ("Whenever a laboratory offers or gives to a source of referrals anything of value not paid for at fair market value, the inference may be made that the thing of value is offered to induce the referral of business."); 2014 OIG Special Fraud Alert (advising the same). Thus, whether or not STF alleged why routine waivers of co-pays or deductibles might run afoul of the AKS, STF managed to raise an inference that they do.

2020 WL 2614959, at *10 (N.D. Cal. May 23, 2020).

The Court also rejects Vibrant's argument that Relator was required to allege facts

showing that the waivers were not offered based on financial hardship.  The OIG has explained that "under the anti-kickback statute, neither a legitimate business purpose for the arrangement, nor a fair market value payment, will legitimize a payment if there is also an illegal purpose (*i.e.*, inducing Federal health care program business)." *U.S. ex rel. Bartlett v. Ashcroft*, 39 F. Supp. 3d 656, 678 (W.D. Pa. 2014) (quoting OIG Supplemental Compliance Program Guidance for Hospitals, 70 Fed.Reg. 4858, 4864 (Jan. 31, 2005)).  Rather, the relevant question is whether "*one* purpose of the remuneration [is] to induce or reward the referral or recommendation of business payable in whole or in part by a Federal health care program[.]"  *Id.* (emphasis added);  *see also United States v. Berkeley Heartlab, Inc.*, 225 F. Supp. 3d 487, 499 n. 3 (D.S.C. 2016) ("*Berkeley Heartlab I*") ("the appropriate test for whether the waiver of a copay constitutes remuneration is whether the complaint has alleged that at least one of the purposes of the waiver was to induce patient referrals.") (citation omitted).  Thus, Relator is not required to allege facts showing that Vibrant waives copays and deductibles *exclusively* to induce referrals or that Vibrant's waivers are not sometimes justified as to specific patients based on financial hardship.  Rather, it is sufficient that Relator has alleged facts showing that Vibrant offers to waive copays and deductibles as to *all* of a referring physicians' patients to induce referral of patients, including Medicare and Medicaid patients.

The Court also rejects Vibrant's argument that Relator's complaint does not satisfy the pleading requirements of Rule 9(b) with respect to the waiver scheme.  First, the Complaint alleges specific details about the scheme: that to induce referrals "Vibrant does not charge patients any amount in excess of $25, regardless of the patient's responsibility" and "agrees not to send any patients to collections, even if the $25 is never paid" (the "what"); that in one case, in April 2016, Vibrant's Southern California sales representative, Tanja Elliot, explained the policy to a Southern California physician (the "who" and "when"); that Vibrant does not list the policy on its website but instead communicates personally through sales representatives, and that it instructs physicians to tell their patients to ignore any deductible or copay charges (the "how").

Vibrant argues that these allegations are not sufficient, pointing to *Georgia v. Lab. Corp. of Am.*, No. 1:13-CV-1838-SCJ, 2015 WL 12591797, at *1 (N.D. Ga. May 19, 2015).  In that case

the relator alleged that the defendants "provided kickbacks in the form of deeply discounted private rates to draw in large volumes of pull through' Medicaid and other referrals." 2015 WL 12591797 at *1. Although the relator listed examples of such low rates in the complaint, the Court found that the complaint did not allege "any specific kickback" and did not satisfy Rule 9(b) because it did not "identify[ ] an improper/illegal referral or Medicaid claim from such referral." *Id.* at *4. The Court finds that *Georgia v. Lab. Corp.* is distinguishable to the extent the FCA claims in that case are based on a theory that differs from the waiver theory here; instead of alleging that a uniform promise is made to cap payments at $25, the relator in *Georgia v. Lab. Corp.* alleged that the kickback in that case took the form of discounted rates, which apparently varied. Therefore, that case sheds little light on the adequacy of the pleadings here.

Vibrant also argues that Relator fails to meet the heightened pleading standard as to whether the waivers are remuneration to referring physicians or inducements to make referrals. Again, the Court disagrees. With respect to the first argument, Vibrant relies heavily on *United States v. Chang*, No. CV133772DMGMRWX, 2017 WL 10544289 (C.D. Cal. July 25, 2017)). For the reasons set forth above, the Court finds the reasoning of that case to be unpersuasive and declines to follow it. Rather, the undersigned agrees with the reasoning of *Crescendo*, *Boston Heart* and *Berkeley Heartlab I* discussed above, in which the courts found that the relators had sufficiently pled under Rule 9(b) FCA claims based on allegations that the defendants had promised to waive or cap the copays of referring physicians' patients.

The Court also rejects Vibrant's argument that Relator has not satisfied Rule 9(b) in alleging that the fee waiver was offered as an inducement for referrals. Vibrant points out that the complaint "does not detail any instance of anyone at Vibrant informing any referral source that patients' copayments of deductibles would be capped or waived *in exchange* for the referral of business." Motion at 15. However, the complaint raises a strong inference that that is exactly what Vibrant's policy was aimed at, alleging that Vibrant does not post the policy on its website because it "knows this strategy is illegal because it provides a significant benefit to a referring physician." Complaint ¶ 48. The complaint also provides a specific example of Vibrant's effort to conceal its kickback scheme, alleging that a specific sales representative, Tanja Elliot,

personally communicated it to a physician in Southern California in 2016.  *Id.*

### c.   Reliable Indicia

Vibrant also argues that the complaint is deficient because it does not offer any specific examples of "pull through Medicare and Medicaid business" to establish that false claims have been made on a federal health care program.  Motion at 15.  Moreover, Vibrant asserts, Relator has not alleged "reliable indicia" that raise a strong inference that false claims were actually submitted because "Relator is an outsider with no actual knowledge of its allegations."  *Id.* at 16.  As  discussed above,  the Ninth Circuit has held that a relator is not required under Rule 9(b) to identify representative examples of false claims in order to adequately allege that false claims were submitted, though that  is "one means of meeting the pleading obligation."  *Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010).  Rather, the heightened pleading requirement can also be satisfied by "alleg[ing] 'particular  details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.'"  *Id.* (quoting *United States ex rel. Grubbs v. Ravikumar Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)).  "A complaint provides the requisite indicia of reliability where 'specific allegations of the defendant's fraudulent conduct necessarily [lead] to the plausible inference that false claims were presented to the government.'"  *United States v. Berkeley Heartlab, Inc*., 247 F. Supp. 3d 724, 729 (D.S.C. 2017) (*Berkeley Heartlab II*") (quoting *U.S. ex rel. Nathan v. Takeda Pharm. N. Am., Inc*., 707 F.3d 451, 457 (4th Cir. 2013)).

Here, Relator has alleged specific facts about two different schemes involving fraudulent conducts and has also provided direct evidence of the processing fee scheme in the form of contracts and payments.  These allegations provide reliable indicia that false claims were submitted to Medicare and Medicaid.  *See Berkeley Heartlab II,* 247 F. Supp. 3d at 731 ("There is no need for the Riedel FAC to distinguish between legal and illegal referrals as he has alleged that all referrals from some physicians and practices were tainted by the improper promise of co-payment and deductible waivers.").

### 2.  Whether Claims Adequately Allege Materiality

Vibrant argues that Relator's FCA claims fail because it has not alleged that fraud was

material to the government's decision to pay a claim, citing *Escobar*, 136 S. Ct. (2016). Motion at 16.   The Court disagrees.

Under the False Claims Act, a falsehood is material if it has "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).   In *Escobar*, the Court addressed whether an FCA claim can be asserted under an implied certification theory and found that it can so long as a claim "does not merely request payment, but also makes specific representations about the goods or services provided; and  . . . the defendant's failure to disclose noncompliance with material statutory, regulatory or contractual requirements makes those representations misleading half-truths."  *Id*. at 2001.   It cautioned that "[t]he materiality standard is demanding" because "[t]he False Claims Act is not an all-purpose antifraud statute . . . or a vehicle for punishing garden-variety breaches of contract or regulatory violations."  *Id*. at 2003 (internal quotation and citation omitted).   Thus, for example, "[a] misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment."  *Id*.

Here, however, Relator's claims are not based on a theory of implied certification.   Relator is not seeking to turn a "garden-variety" regulatory violation into an FCA claim.   Instead, it is asserting its FCA claims under the Anti-Kickback Statute.   Congress amended the Anti-Kickback Statute in 2010 as part of the Affordable Care Act to provide that "a claim that includes items or services resulting from a violation of [the Anti-Kickback Statute] constitutes a false or fraudulent claim for purposes of [the FCA]."  42 U.S.C. § 1320a-7b(g).   In other words, where it is adequately alleged that claims for Medicare and Medicaid reimbursement cover services that were provided as a result of a violation of the Anti-Kickback Statute, the materiality requirement is adequately alleged.  *See United States ex rel. Wood v. Allergan, Inc.,* 246 F. Supp. 3d 772, 812 (S.D.N.Y. 2017), *rev'd on other grounds and remanded,* 899 F.3d 163 (2d Cir. 2018) (finding that the 2010 amendment to the FCA under the Affordable Care Act "ma[d]e plain" that to the extent the relator adequately alleged a claim under the Anti-Kickback Statute its FCA claim was also adequately pled). Because the Court finds that Relator has adequately alleged violations of the

1    Anti-Kickback Statute, the Court rejects Vibrant's argument that Relator's claims fail because

2    they do not allege facts establishing materiality.

3    ###    3.   Whether Claims Adequately Allege Scienter

4            Although Rule 9(b) requires that "a party must state with particularity the circumstances

5    constituting fraud[,]" its heightened pleading standard does not apply to "[m]alice, intent,

6    knowledge, and other conditions of a person's mind[,] [which] may be alleged generally." Fed. R.

7    Civ. P. 9(b).  Vibrant recognizes that under Rule 9(b), the scienter element of an FCA claim must

8    only meet the general plausibility standards of Rule 12(b)(6) and Rule 8 but contends that standard

9    is not met by Relator's complaint.  Motion at 17-19.  The Court disagrees.

10           The Ninth Circuit has held that under Rule 9(b), a complaint "needs only to allege facts

11   supporting a plausible inference of scienter." *Winter ex rel. United States v. Gardens Reg'l Hosp.*

12   *& Med. Ctr., Inc.*, 953 F.3d 1108, 1122 (9th Cir. 2020) (citing *United States ex rel. Lee v.*

13   *Corinthian Colls.*, 655 F.3d 984, 997 (9th Cir. 2011)).  In *Winter*, it further explained that "unlike

14   in common law fraud claims, a plaintiff need not prove a 'specific intent to defraud' under the

15   FCA—the Act imposes liability on any person acting 'knowingly,' which includes acting with

16   'actual knowledge,' as well as acting 'in deliberate ignorance,' or 'in reckless disregard of the

17   truth or falsity of the information[.]'" *Id.* (quoting 31 U.S.C. § 3729(b)(1)).

18           Like the courts in *Crescendo* in *Berkeley Heartlab I*, the Court finds that this standard is

19   met based on the fee processing and waiver schemes alleged in the complaint.  *See Crescendo,*

20   2020 WL 2614959, at *9 (holding that drawing all reasonable inferences in favor of the relator,

21   allegations that defendant's processing fee contract went to "great lengths to describe this

22   ['processing'] fee as 'fair market value' for the physician's work" supported a plausible inference

23   that the defendants "knew their practice was prohibited [remuneration] and were trying to stay one

24   step ahead of the string of successful cases holding other laboratories responsible for the same

25   conduct.");  *Berkeley Heartlab I*, 225 F. Supp. at 500 (holding that scienter was adequately alleged

26   based on allegations that "(1) a purpose of the [processing and handling] fees was to induce

27   referrals . . . ; (2) Defendants knew of the illegality of the [processing and handling] fees and tried

28   to disguise them by calling them [processing and handling] fees instead of draw fees  . . .; and (3)

1    Defendants received emails from physician practices and their attorneys asserting that the

2    processing and handling fees were kickbacks[.]").

3         As to the processing fee scheme, Relator has alleged that physicians are "told that their

4    relatives and staff members can enter into sham contracts with Vibrant," advised that in the case of

5    family members, it should be a family member "with a different last name, so as not to raise

6    suspicions," that the draw fees paid by Vibrant were called "processing and handling fees" rather

7    than "draw fees," and that it paid the fees even where the "independent contractor" did not

8    perform the services and was not licensed to perform the services.  Complaint ¶¶ 32, 33, 39, 41.

9    As to the waiver scheme, Relator alleges that "Vibrant knows this strategy is illegal because it

10   provides a significant benefit to a referring physician" and that "[i]n an effort to conceal its

11   scheme and avoid liability, Vibrant does not list this policy on its website."  *Id.*  ¶ 48.  These

12   allegations are sufficient to raise a plausible inference of scienter.

13        **C.     CFCA Claims**

14        Vibrant asserts that Relator's claims under the CFCA "fail for the same reasons as

15   Relator's federal FCA claims[.]"  Motion at 19.  The Court rejects Vibrant's challenges to the

16   CFCA claims for the same reasons it finds that the FCA claims survive Vibrant's motion to

17   dismiss.

18        **D.     IFPA Claims**

19             **1.     Whether Standing is Adequately Alleged**

20        Under the IFPA, "[a]ny interested persons, including an insurer, may bring a civil action

21   for a violation of this section for the person and for the State of California."  Cal. Ins. Code §

22   1871.7(e)(1).  Vibrant argues that Relator's IFPA claims fail because there are no allegations

23   establishing that Relator is an "interested person," citing *United States v. Lab. Corp. of Am.*

24   *Holdings*, No. 9:14-CV-3699-RMG, 2019 WL 236799 (D.S.C. Jan. 16, 2019) ("*Lutz*").

25        In *Lutz*, the relators asserted *qui tam* claims under the federal FCA, the California IFPA

26   and the Illinois IFPA based on "several fraudulent schemes impacting government health care

27   programs, such as billing for medically unnecessary tests and paying kickbacks to physicians for

28   ordering tests from LabCorp[,]" among other things.  2019 WL 236799 at *1.  Both the California

United States District Court
Northern District of California

1   IFPA and the Illinois IFPA (which was patterned after the California law) allow an "interested

2   person" to bring an enforcement action, and the defendants in *Lutz* argued that the relators' claims

3   should be dismissed on the pleadings because the relators were not "interested persons."  *Id*.  The

4   court agreed, finding that "based on case law in Illinois and California, something more than

5   merely being a source of the information or standing to gain from any ultimately recovery is

6   required to qualify as an 'interested person' under the statutes."  *Id*. at *5.  Because the complaint

7   did "not allege that [the] [r]elators [had] any contacts, were employed or were in any other way

8   affected by or involved in the submission of allegedly false claims and/or kickback tainted claims

9   in California or Illinois," the court concluded they were not "interested person[s]" under either

10  California or Illinois law.  *Id.*

11          In reaching this conclusion, the Court in *Lutz* rejected the relators' argument that a more

12  "expansive" interpretation of "interested person" should be applied.  *Id*.  The relators cited two

13  California cases in support of this argument:   *People ex rel. Strathmann v. Acacia Research*

14  *Corp*., 210 Cal. App. 4th 487 (2012) ("*Strathmann*") and *People ex rel. Alzayat v. Hebb*, 18 Cal.

15  App. 5th 801 (2017) ("*Alzayat*").  In *Strathmann,* the court addressed whether the plaintiff's IFPA

16  claims were exempt from California's anti-SLAPP law because they were "brought solely in the

17  public interest or on behalf of the general public."  210 Cal. App. 4th at 499 (citing Code of Civil

18  Procedure section 425.17).  The court concluded that they were, explaining that the plaintiff was

19  "an 'interested person' bringing this action as a qui tam relator."  *Id*. at 500.  The court explained

20  further, "[a] qui tam relator is essentially a self-appointed private attorney general, and his

21  recovery is analogous to a lawyer's contingent fee. The relator has no personal stake in the

22  damages sought—all of which, by definition, were suffered by the government."  *Id*. at 501

23  (internal quotation and citation omitted).   In *Alzayat*, the court addressed whether the exclusivity

24  of the California Workers' Compensation law barred a claim under the IFPA and found that it did

25  not.  18 Cal. App. 5th at 829.  The court found that "[a]s a true qui tam provision, Insurance Code

26  section 1871.7 does not mandate that the relator has suffered his or her own injury" and further

27  noted that the lawsuit under section 1871.7 was "based on an injury allegedly suffered by the

28  People of the State of California, and was not filed for the purpose of remedying an injury suffered

by [the relator]." *Id*. at 831.

The court in *Lutz* found *Strathmann* and *Alzayat* to be unhelpful, however, because they did not directly address the meaning of the term "interested party." 2019 WL 236799 at *5. Instead, it looked to two other California cases that addressed the meaning of that term in the context of other statutes: *Associated Boat Indus. of N. Cal. v. Marshall*, 104 Cal. App. 2d 21 (1951) ("*Marshall*"), disapproved of on other grounds by *Envtl. Prot. Info. Ctr. v. Dep't of Forestry & Fire Prot.*, 43 Cal. App. 4th 1011 (1996); and *Torres v. City of Yorba Linda*, 13 Cal. App. 4th 1035, 1041 (1993), as modified on denial of reh'g (Mar. 25, 1993).

In *Marshall*, the plaintiff was a trade association that challenged a regulation adopted by the defendant, seeking declaratory relief under California Government Code section 11440, which allowed "[a]ny interested person [to] obtain a judicial declaration as to the validity of any regulation by bringing an action for declaratory relief in the superior court in accordance with the provisions of the Code of Civil Procedure." 104 Cal. App. 2d at 22. The court addressed whether the trade association – as opposed to the members of the trade association who were directly affected by the regulation – qualified as an "interested person" under the declaratory relief law and concluded that it did not. *Id.* In reaching this conclusion, it looked to the accepted definition of the term "interested person" under probate law ("requir[ing] a direct and primary interest in the testator's estate") and California law governing intervention (requiring a "direct, and not consequential" interest that is "of such a direct and immediate character that the intervener will either gain or lose by the direct legal operation and effect of the judgment"). In finding these requirements also applied to the declaratory judgment law, the court cited the rule that "[t]he legislature is presumed to know the court decisions construing similar language in other statutes and where legislation is framed in the language of an earlier enactment on the same or an analogous subject, which has been judicially construed, there is a very strong presumption of intent to adopt the construction as well as the language of the prior enactment." *Id*. at 23 (internal quotation and citation omitted).

In *Torres*, the plaintiffs challenged a redevelopment project and the defendant brought a demurrer arguing that the plaintiffs lacked standing under California Code of Civil Procedure

United States District Court
Northern District of California

United States District Court
Northern District of California

1    section 387, requiring that "[e]very action must be prosecuted in the name of the real party in

2    interest. . . ." 13 Cal. App. 4th at 1038.  The court agreed, noting that "[g]enerally, a plaintiff must

3    show he or she or those he or she properly represents have either suffered or are threatened with an

4    injury of sufficient magnitude that it is reasonably assured the lawsuit will provide an adequate

5    presentation of all relevant facts and issues."  *Id.* at 1041 (internal quotation and citation omitted).

6         Finally, the *Lutz*  court relied on a case decided by an Illinois court that addressed the

7    meaning of "interested party" under both the California IFPA and the Illinois IFPA, *State of*

8    *Illinois ex rel. Jocelyn Zolna-Pitts v. ATI Holdings, Inc*., No. 12CH27483, 2013 WL 3779568, *1

9    (Ill.Cir.Ct. June 18, 2013) ("*Zolna-Pitts*").  In that case, the court noted that unlike other

10   whistleblower statutes that allow actions to be brought by "a person," the IFPA allows an action to

11   be brought by an "interested person."  2013 WL 3779568, at *2 (citing as an example the Illinois

12   Whistleblower Reward and Protection Act, 740 ILCS 175/4).  Because "interested person" is not

13   defined under the IFPA, the court looked to the "ordinary and popularly understood meaning" of

14   "interested," citing the dictionary definition of "interested" as "being affected or involved."  *Id*.

15   (quoting Merriam Webster's Collegiate Dictionary (11th Ed. 2009)). The court rejected the

16   defendant's reliance on the definition of "interested person" as used in probate, requiring that an

17   individual have a financial interest or property, reasoning that "because the Probate Act and the

18   ICFPA have very different objectives  . . . the Probate Act provides limited guidance as to what

19   the ICFPA means by 'interested person.'"  *Id.*   Thus, relying on the dictionary definition alone,

20   the court rejected the plaintiff's assertion that she had standing because she paid for health

21   insurance, finding that no false claims had been alleged to have been made by her insurers.  *Id*. at

22   *3.  On the other hand, the court found that the plaintiff was an interested person nonetheless

23   because she had formerly been an employee of the defendant and in that capacity had been ordered

24   to follow the allegedly fraudulent procedures of her employer.  *Id*.

25        Having considered the cases cited by the *Lutz* court in support of its interpretation of the

26   ":interested person" requirement of the IFPA, the undersigned is not persuaded that it is correct.

27   Both of the California cases upon which it relied (*Marshall* and *Torres*)  interpreted the phrase in

28   the context of statutes that are premised upon a requirement that the plaintiff must suffer some

concrete injury. As the Illinois court in *Zolna-Pitts* observed with respect to the probate statutes cited by the defendant in that case, however, the IFPA is a very different statute; under the IFPA, a plaintiff has *no* personal stake, as explained in *Strathmann* and *Alzayat*. On the other hand, while the court in *Zolna-Pitts* declined to rely on such statutes to interpret the IFPA (in this Court's view, correctly), it did not explain how the dictionary definition it relied upon supported its specific conclusions as to the plaintiff's standing in that case.

The undersigned finds that a more recent Illinois decision, *State ex rel. Leibowitz v. Family Vision Care, LLC*, 128 N.E.3d 422, 433 (Ill. App. Ct.), appeal allowed, 132 N.E.3d 367 (Ill. 2019), supports the more expansive definition of "interested person" that the *Lutz* court rejected. In *Leibowitz*, the court looked to California law to interpret the term "interested person" in the Illinois IFPA, finding that an "interested person" is someone who "has nonpublic information of possible wrongdoing." *Id*. at 434. In that case, the plaintiff was a former employee who had knowledge of the defendant's allegedly fraudulent billing practices. *Id.* at 426. The court found that she was an interested person "by virtue of her whistleblower status." *Id*. at 434. In reaching this conclusion, the court recognized that the "interested person" requirement under the IFPA differs from the language of the FCA, allowing a "person" to bring a whistleblower action, but rejected the defendant's argument that this must mean that under the IFPA a plaintiff must have a "direct interest" in the IFPA claim. *Id*. at 433. The court pointed to the holding in *Alzayat*, discussed above, which it found to be inconsistent with the defendant's argument. *Id.* It further noted that the cases on which defendants relied, which included *Torres*, drew on statutes that were very different from the IFPA, observing that "[t]he definition or meaning of a word cannot be blindly transferred from one context to another." *Id.* The court also found that the word "interested" was used in the IFPA to qualify the word "person" only once whereas the word "person" without that qualifier was used 29 times. *Id*. at 434. The court therefore concluded that the word "interested" in the IFPA "is descriptive rather than restrictive." *Id.*

In light of the purpose of the IFPA, and because California courts have made clear that a plaintiff who brings a claim under that statute does so as a *qui tam* relator and not based on any personal stake in the action, the Court concludes that an "interested person" is someone who has

35

1  nonpublic information of possible wrongdoing.  Here, however, Relator has included no

2  allegations in the complaint addressing this requirement.  Therefore, the Court finds that Relator's

3  IFPA claims are insufficiently pled as to standing.  As Relator may be able to remedy this defect,

4  it will be given leave to amend as to these claims. [5]

5  **IV.     CONCLUSION**

6         For the reasons stated above, the Motion is GRANTED in part and DENIED in part.  The

7  Motion is GRANTED as to Claims Three through Six (the IFPA claims), which are dismissed

8  with leave to amend to allege facts showing that Relator is an "interested party."  The Motion is

9  DENIED in all other respects. Relator's amended complaint shall be filed within 45 days of the

10  date of this Order.

         **IT IS SO ORDERED.**

12  Dated:  August 19, 2020

                                                    _____
                                                    JOSEPH C. SPERO
                                                    Chief Magistrate Judge

United States District Court
Northern District of California

---

[5] Vibrant also challenges the IFPA claims on the basis that they are insufficiently alleged under
Rule 9(b), largely repeating the arguments it made as to the FCA claims.  The Court rejects these
arguments for the same reasons it rejects Vibrant's arguments as to the FCA claims.

36